## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CASSANDRA DENOMA,                                            Case No. 1:12-cv-831
      Plaintiff,                                    Litkovitz, M.J.


      vs.


HAMILTON COUNTY COURT OF                            **ORDER**
COMMON PLEAS, et al.,
      Defendants.

      This matter is before the Court on defendants' motion to dismiss/motion for summary judgment brought by Hamilton County Court of Common Pleas, Michael Walton and Judge Charles J. Kubicki, Jr., in his official capacity only (Doc. 52), and defendant Charles J. Kubicki, Jr.'s motion for summary judgment (Doc. 53); plaintiff's response in opposition to defendants' motions (Doc. 57); and defendants' reply memorandum in support of the motions (Doc. 59).

## I. Background

      Plaintiff Cassandra (Casey) DeNoma, who was employed as an Adult Probation Officer with the Hamilton County, Ohio Probation Department (Probation Department) beginning in 1992, brings this action against defendants Hamilton County Court of Common Pleas (Hamilton County CCP), a judicial body created, organized and operated under the auspices of Ohio Rev. Code § 2301, *et. seq.*; Michael Walton, who was at all relevant times the County Court Administrator and the Chief Administrative Officer for the Probation Department; and Judge Charles J. Kubicki, Jr., who at all relevant times was the head of the Probation Committee for the Hamilton County CCP. (Doc. 6, Amended Complaint). Defendant Walton is sued in his individual capacity only and Judge Kubicki is sued in his official capacity as Presiding Administrative Judge as well as in his individual capacity. (*Id.*).

Plaintiff alleges that the Hamilton County Probation Department has a pattern and practice of discriminating against women.  Plaintiff alleges that under Walton's command, the Probation Department "has strongly resembled a 'boys club' in that preferential treatment is given to men in appointments, assignments and work conditions."  (*Id*., ¶13).  Specifically, plaintiff alleges that Walton treated her less favorably than males in the Probation Department and marginalized her despite her status as Director of the Probation Department's Intensive Supervised Probation (ISP) unit, a position she assumed in 2006.  (*Id*., ¶¶ 12, 14).  For example, Walton allegedly excluded plaintiff from meetings with court and state officials on matters directly affecting the state grant she had the responsibility to oversee; he failed to include her in discussions and strategy sessions affecting operations and personnel in the Probation Department and instead consulted males with experience and in positions that were not equal to hers; and he violated Probation Department policy by routinely providing performance evaluations to male employees while denying them to plaintiff.  (*Id*., ¶ 14).

Plaintiff further alleges that she encouraged and advised Lisa Egner, a female employee concerned about sexual harassment by Walton, to contact the Human Resources Department in August 2010 and the Equal Employment Opportunity Commission (EEOC) in October 2010. (*Id*., ¶¶ 15-18).  Plaintiff alleges that in October 2010, Walton advertised an opening for an Assistant Chief Probation Officer (ACPO), and plaintiff was one of eight applicants for the position.  (*Id*., ¶¶ 19-20).  Plaintiff alleges that Judge Kubicki appointed a selection committee to screen applicants and make recommendations and although Walton was not a member of the committee, Walton exercised significant influence over the selection decision.  (*Id*., ¶ 21).

Plaintiff alleges that "in the meantime," Egner met with Krista Ventre, the CCP Personnel Director and a member of the selection committee, to discuss Walton's sexual

harassment and informed Ventre that plaintiff had provided Egner with contact information for the EEOC and had encouraged her to file a discrimination charge.  (*Id.*, ¶ 23).  Plaintiff alleges that Ventre instituted an investigation into Walton's conduct and plaintiff's assistance to Egner, and on November 9, 2011, plaintiff was asked to meet with Ventre and an attorney retained by the County to investigate Egner's complaint.  (*Id.*, ¶ 24).  Plaintiff further alleges that Judge Kubicki informed the selection committee that she could not serve as ACPO due to her involvement with Egner.  (*Id.*, ¶ 25).  Plaintiff contends that the selection committee recommended a candidate, Joe Elfers, whose experience and qualifications were no better, if not inferior, to those of plaintiff.  (*Id.*, ¶ 27).

Based on these allegations, plaintiff brings a claim under 42 U.S.C. § 1983 against defendant Judge Kubicki in his official and individual capacities and against defendant Walton in his individual capacity, alleging that defendants violated her right under the Equal Protection Clause of the United States Constitution to be free from discrimination on account of sex in the terms and conditions of her employment.  (Count 1).  Plaintiff also brings claims under Ohio Rev. Code. Ch. 4112, alleging that (1) defendants violated plaintiff's right under state law to be free from discrimination on the basis of gender in the terms and conditions of, and opportunities for, employment (Count 2), and (2) defendants violated her right under state law to be free from retaliation for opposing discrimination or encouraging others to exercise their right to be free from acts of discrimination.  (Count 3).  Plaintiff seeks as relief instatement to the position of Assistant Chief of the Probation Department or, in the alternative, an award of front pay; damages for economic and non-economic injuries; punitive damages; and attorney fees and costs.

## II. Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Scott v. Harris*, 550 U.S. 372, 380 (2007). All inferences must be drawn in the nonmoving party's favor unless they are "unreasonable" or "impermissible." *Jones v. Potter*, 488 F.3d 397, 407 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008); *Ross v. Duggan*, 402 F.3d 575, 588 (6th Cir. 2004) ("naked speculation, conjecture, hunches, hypothesizing, intuitions, innuendo, insupportable 'inferences,' empty theorizing, creative guesswork, and wishful thinking" are insufficient to withstand summary judgment).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id*. (citing *Cities Serv*., 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv*., 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

### III.  Undisputed Facts

#### A.  Plaintiff's initial hire

Plaintiff was hired into the Hamilton County Adult Probation Department (Probation Department), a department of the Hamilton County Court of Common Pleas, in 1992 as a Probation Officer. (Doc. 50, Pltf. Depo. at 30; Doc. 39, Ventre Depo. at 17). Plaintiff was assigned to the Intensive Supervised Probation (ISP) unit, which serves as a sentencing option for judges to divert habitual felony criminal offenders from the prison system through intensive supervision. (Doc. 50, Pltf. Depo. at 46-47; Doc. 43, Robert Veatch Depo. at 10-11). The program is funded by the State of Ohio through a Community Corrections Actions (CCA) grant. (Doc. 50, Pltf. Depo. at 46).

Employees of the Probation Department, CCP division, are employees of the Hamilton County CCP. (Doc. 45, Kubiki Depo. at 8). Defendant Walton served as Court Administrator of the CCP from 1995 until he retired in August 2012. (Doc. 48, Walton Depo. at 7-9). Walton also served intermittently as the Chief Probation Officer from 2000 until his retirement. (*Id*.). In his capacity as Court Administrator, Walton did not have the power to hire, fire or promote individuals. (*Id*. at 10-11). Hamilton County CCP Probation Officers are hired, fired, and/or promoted by an entry signed by a majority of the 16 Hamilton County CCP  judges. (Doc. 45,

Kubiciki Depo. at 9-11).  Walton was, however, sometimes requested by the CCP to make recommendations regarding such decisions.  (Doc. 48, Walton Depo. at 11).

The Hamilton County CCP has a Probation Department Committee consisting of six to seven CCP judges appointed by the Presiding Judge, which is responsible for oversight of the CCP Adult Probation Department.  (Doc. 45, Kubicki Depo. at 25-27; Doc. 48, Walton Depo. at 15-16).  Judge Kubicki served as chair of the Probation Committee during the 2010 time frame. (Doc. 45, Kubicki Depo. at 29-30).  A Hamilton County CCP judge, and in particular a Presiding Judge, could influence appointments in the Probation Department.  (Doc. 42, Timothy Shannon Depo. at 48; Doc. 43, Veatch Depo. at 196-97; Doc. 48, Walton Depo. at 20-21).

### B.  Plaintiff's 1996 promotion

Four years after plaintiff's hire, in 1996, a vacancy was created in the position of ISP Probation Officer Supervisor.  (Doc. 43, Veatch Depo. Exh. 53).  Plaintiff was promoted to the position effective May 30, 1996.  (*Id*.).  Judge Robert Ruehlman, the Presiding Judge of the Hamilton County CCP at the time who was a friend of plaintiff, "pushed through" her application for the open position "because of [his] friendship" with plaintiff.  (Doc. 52-1, Ruehlman Aff., ¶¶ 3, 4).  Judge Ruehlman acknowledges that "there may have been more qualified individuals that had applied."  (*Id*., ¶ 4).  Robert Veatch and Tom Moxley also held the position of ISP supervisor, and each of the three supervisors was responsible for managing a group of approximately six probation officers.  (Doc. 50, Pltf. Depo. at 119).

### C.  Plaintiff's 2006 promotion to ISP Project Director

In 2006, the position of ISP Project Director became vacant.  (Doc. 43, Veatch Depo. Exh. 54).  All three ISP supervisors applied for the position.  (Doc. 39, Ventre Depo. Exh. 2). Effective December 14, 2006, plaintiff was promoted to ISP Project Director.  (Doc. 43, Veatch

6

Depo. Exh. 54).  Judge Ruehlman, who was the Presiding Judge at that time, "pushed through Ms. Denoma's application for the open Intensive Supervision Probation Director position because of [his] friendship with Ms. Denoma and because she worked on campaigns[.]"  (Doc. 52-1, Ruehlman Aff. at ¶¶ 5, 6).  Judge Ruehlman acknowledges that "there may have been more qualified individuals that had applied."  (*Id*., ¶ 6).  Judge Ruehlman put pressure on the other Hamilton County CCP judges to appoint plaintiff to the position.  (Doc. 48, Walton Depo. at 20). Defendant Walton did not think plaintiff was the "best person" for the ISP Project Director position, but he did not want to interfere with Judge Ruehlman's desire to have plaintiff promoted to that position.  (*Id*. at 49-50).  Walton considered Veatch to be the most qualified of the three applicants for the position.  (*Id*. at 79).  Shannon, a member of the interview committee for the ISP Project Director, also considered Veatch to be the most qualified candidate based on his experience and he was Shannon's actual choice; however, Shannon recommended plaintiff based on a conversation with Judge Ruehlman during which Judge Ruehlman expressed what Shannon understood to be a clear preference for plaintiff.  (Doc. 42, Shannon Depo. at 35-37).

The essential functions of the ISP Project Director position include supervising probation officer supervisors and administrative and support staff, including scheduling, assigning and reviewing work, and evaluating and making recommendations for corrective measures, promotions, and merit increases; composing quarterly and annual probation progress reports for the County and State; composing annual CCA grant proposals to the Ohio Department of Rehabilitation and Correction (ODRC); and overseeing ISP budget control and preparation. (Doc. 39, Ventre Depo. Exh. 3).  The ISP Project Director reports to the Assistant Chief Probation Officer for the CCP (*Id*.), which was Shannon from the date of plaintiff's promotion until September 2007 (Doc. 50, Pltf. Depo. at 117) and Patricia Clancy from October 2007 until

7

January 2009.  (*Id*. at 117-18; Doc. 51, Clancy Depo. at 9-10).  After Clancy left, the ACPO

position remained vacant until Joe Elfers was promoted to the position at the end of 2010.  (Doc.

39, Ventre Depo. at 62).  Walton supervised plaintiff following Clancy's departure.  (Doc. 48,

Walton Depo. at 14, 51, 55; Doc. 50, Pltf. Depo. at 117).

      On her first day as ISP Project Director, plaintiff attended a meeting with representatives

of the State who explained that although Hamilton County routinely received the most grant

money per capita of any Ohio county, it had the highest recidivism rate of any ISP program in

the State.  (Doc. 50, Pltf. Depo. at 137-38).  One of the issues was the CCP judges were reluctant

to utilize the program, and they could not be required to do so.  (*Id*. at 142; Doc. 39, Ventre

Depo. at 232).  After Christopher Galli, Assistant Chief for the Bureau of Community Sanctions

for the State of Ohio (Doc. 39, Ventre Depo. Exh. 32), began overseeing the grant,

communications began to come from Galli to plaintiff through Walton.  (Doc. 43, Veatch Depo.

at 229-30).  In June 2009, Galli made a presentation to representatives of CCP informing them

that the ISP's success rate was at the low end as compared to other counties and it was in danger

of losing its funding.  (Doc. 39, Ventre Depo. at 223-24).  Krista Ventre, Personnel Director for

the Hamilton County CCP and Municipal Court since 2003, attended the 2009 presentation.

(Doc. 39, Ventre Depo. at 21, 226).  Plaintiff was not present for the presentation.  (Doc. 50, Pltf.

Depo. at 136-37).  In July of 2009, Galli copied plaintiff on an email to Walton and others which

included research information discussed at a meeting a few weeks prior and a link to the study

upon which ODRC's 2009 report was based.  (Doc. 50, Pltf. Depo. Exh. 109).

      In July 2010, Walton received an email from Galli regarding the ISP Program with a

"Hamilton County ISP Prison Diversion Program - 1 Year Progress Report" attached.  (*Id*.,

Depo. Exh. 118).  The report concluded that the ISP program had made acceptable

improvements to the program and to its successful completion rate to allow continued funding at the current rate. (*Id*.). However, the report noted ongoing concerns in a number of areas, including the number of offenders being served by the program relative to its funding level; the lack of a full-time probation chief; ISP supervisor capacity and functions; caseload management; and quality assurance policies and processes. (*Id*.). The report concluded that additional funding would not be made available until sustained improvement in these areas was shown. (*Id*.). The day after he received the email, Walton forwarded the report to plaintiff and asked that she review it and meet with him to discuss it. (*Id*., Depo. Exh. 119).

### D. 2009 Lausten/Moxley investigation

In October of 2009, an investigation of Dick Lausten, a Probation Officer assigned to the ISP unit under Moxley's supervision, was undertaken by Ventre with some assistance from others. (Doc. 40, Ventre Depo. at 247-48). The investigation and pre-disciplinary hearing findings led to Lausten's removal effective May 17, 2010, by entry of the judges of the Hamilton County CCP for incompetency, discourteous treatment of the public, neglect of duty, violation of the court's policy, failure of good behavior, misfeasance, malfeasance, and nonfeasance. (Doc. 50, Pltf. Depo. Exh. 115). Specifically, it was determined that Lausten had used the Regional Computer Information Center (RCIC) for personal reasons, and during the investigation he admitted to running the criminal history of his neighbors; he failed to properly process six probation violation warrants which were found on his desk; he failed to provide the appropriate level of supervision of probationers on his caseload; he failed to supervise probationers according to judges' orders; he failed to follow many of the Probation Department's written policies and procedures, including arresting probationers on open warrants, timely filing a jail release form, and issuing travel permits; and he failed to keep accurate records and complete

necessary paperwork.  (*Id*.).  Lausten was also indicted on seven counts of using the RCIC for personal purposes in violation of Ohio law.  (Doc. 50, Pltf. Depo. Exh. 114).  Jerry Campbell, the Hamilton County Municipal Court ACPO who served as the hearing officer for Lausten and Moxley's pre-disciplinary hearings, found that Moxley was not performing audits on Lausten or was overlooking his deficiencies.  (Doc. 41, Campbell Depo. at 35-36).  The Probation Committee disagreed over the level of discipline to impose on Moxley (Doc. 45, Kubicki Depo. at 33), but Moxley resigned before any action was taken against him.  (*Id*. at 151-52).  Walton encouraged the Probation Committee not to take any disciplinary action against plaintiff, and none was ever taken.  (Doc. 48, Walton Depo. at 87).  Plaintiff learned of the Lausten investigation when Walton, Ventre, Elfers and Campbell called her into Campbell's office and informed her that Lausten was not "walk[ing] warrants through," meaning that he was not actually filing the warrant with the court and with central warrants so as to provide for a proper arrestable offense.  (Doc. 50, Pltf. Depo. at 228-29).

### E.  Lisa Egner/Walton relationship

During the fall of 2009, Walton and a probation officer, Lisa Egner, separately informed Ventre that they had begun "socializing together," a relationship which eventually became a dating relationship around late 2009.  (Doc. 39, Ventre Depo. at 83-84).  The dating relationship was consensual.  (Doc. 44, Egner Depo. at 48).  The matter first came to Judge Kubicki's attention when Judge Ruehlman confronted Walton about the relationship at a Probation Committee meeting involving Moxley's discipline.  (Doc. 45, Kubicki Depo. at 36-37).  Ventre and Judge Kubicki discussed the fact that Walton and Egner were having a relationship numerous times prior to September 2010.  (Doc. 39, Ventre Depo. at 93).  Upon becoming aware of the relationship, Ventre and Judge Kubicki wanted to be proactive and protect the CCP in case

10

the relationship ended by documenting that the relationship was consensual. (*Id*.). Ventre contacted a local law firm to inform them of the situation. (*Id*.). Judge Kubicki, with the consent of the Presiding Judge at the time, Judge Kim Burke, took immediate action of establishing that it was a consensual relationship and that Walton would have no say in Egner's career path. (Doc. 45, Kubicki Depo. at 40-42). Both Walton and Egner were interviewed by an outside independent investigator, and it was established that their relationship was consensual. (*Id*. at 42). The initial arrangement was that Egner could report any problems to CCP Judge Beth Myers, and it was subsequently decided that she could report any problems to Judge Kubicki. (*Id*.).

Approximately one year after Egner began dating Walton, she ended or attempted to end the relationship. (Doc. 44, Egner Depo. at 42-43). In late August 2010, Egner informed her supervisor at the time, Veatch, that Walton was harassing her in that "he wouldn't leave her alone." (Doc. 43, Veatch Depo. at 45-46). She claimed that Walton was checking her voice mails and her computer, and she wanted him to leave her alone. (*Id*. at 51-52). Egner also contacted plaintiff by phone seeking assistance, and she sought support and understanding from both Veatch and plaintiff for calling in sick. (Doc. 44, Egner Depo. at 43-44). Egner also complained to Veatch that Ventre, Walton and Brian Urban as a group were making comments and statements about people. (Doc. 43, Veatch Depo. at 52-53). At some point, plaintiff gave Egner the number to the EEOC. (Doc. 50, Pltf. Depo. at 286-87; Doc. 44, Egner Depo. at 35). Veatch believed the harassment by Walton could have been sexual harassment and he had a duty to act on it as Egner's supervisor. (Doc. 43, Veatch Depo. at 54-55). Veatch took the matter to CCP Judge Ralph Winkler and played for him voice mails Egner had left for Veatch on the matter. (*Id*. at 55-56). Judge Winkler informed Veatch that he would take the matter to the

Presiding Judge and Veatch should get Egner involved in the Employee Assistance Program (EAP). (*Id*. at 56-58). Judge Winkler informed Veatch to let the EAP deal with the matter and if Egner had any other issues, she should go through Ventre. (*Id*. at 59). Veatch discussed the matter with plaintiff, who was his direct supervisor at the time, and referred Egner to the EAP. (*Id*.).

At Veatch and plaintiff's suggestion, Egner met with Gary Berger and Laura Maus, employees in the Hamilton County Human Resources Department, to complain about being harassed on the job by Walton. (Doc. 44, Egner Depo. at 33-34, 63). During a meeting with Berger and Maus at which Ventre was present, Walton was informed of Egner's allegations and was further advised that he was not to have any further contact with Egner, to which Walton agreed. (Doc. 48, Walton Depo. at 37; Doc. 39, Ventre Depo. at 90-91).

On October 28, 2010, plaintiff contacted Egner at home and informed her that Egner was going to be receiving a three-day suspension for not filing a "PC" in Judge Jodi Luebbers' courtroom. (Doc. 39, Ventre Depo. at 119). Veatch likewise informed Egner of the potential discipline issue. (Doc. 43, Veatch Depo. at 306). The following day, Egner sent an email to Veatch asking him the result of Judge Luebbers' request for a write-up. (Doc. 43, Veatch Depo. Exh. 66). That same day, Egner went to Ventre's office and complained that Veatch and plaintiff were pressuring her to sue Walton. (Doc. 39, Ventre Depo. Exh. 9, identified in Ventre Depo. at 114; Doc. 44, Egner Depo. at 51, 55-56, 59-60). Egner told Ventre that plaintiff had provided her with a phone number for the EEOC; Egner had met with a lawyer to discuss the possibility of suing Walton and/or the County; and Egner had been in contact with the EEOC. (Doc. 39, Ventre Depo. Exh. 9). Egner complained to Ventre that Veatch and plaintiff were pressuring her to sue Walton or file a complaint with the EEOC. (Doc. 44, Egner Depo. at 59;

12

Doc. 39, Ventre Depo. at 99).  Egner told Ventre she wanted them to stop pressuring her to take action against Walton.  (Doc. 39, Ventre Depo. at 101; Ventre Depo. Exh. 9).  Egner told Ventre that she did not want to file anything against Walton.  (Doc. 39, Ventre Depo. at 101; Ventre Depo. Exh. 9).  Egner testified at her deposition that she felt that she was being "bullied" to not drop her complaint against Walton and she was feeling pressure from plaintiff and Veatch to go to the EEOC and file a lawsuit.  (Doc. 44, Egner Depo. at 35, 45, 51, 55-56).

On November 1, 2010, Ventre met with Judge Kubicki and discussed Egner's complaints.  (Doc. 39, Ventre Depo. at 101-02, 121-122).  Judge Kubicki informed Ventre not to move forward on the discipline requested by Judge Luebbers against Egner.  (Doc. 39, Ventre Depo. at 106-07).  Judge Kubicki consulted legal counsel and decided that the same law firm which had handled the investigation into Egner and Walton's relationship should conduct an outside investigation into Egner's complaints against Veatch and plaintiff.  (Doc. 45, Kubicki Depo. at 97).  Outside counsel, Colleen Blandford, Esq., met with Egner at Ventre's direction on November 8, 2010.  (Doc. 44, Egner Depo. at 56; Egner Depo. Exh. 76).  Egner told Blandford that she was being pressured by plaintiff and Veatch to take action against Walton, which she did not want to do, and she gave a detailed history of what had transpired.  (Doc. 44, Egner Depo. at 122-26, 128-29; Egner Depo. Exh. 76).  The following day, Blandford met with plaintiff and Veatch as part of the investigation into Egner's allegations.  (Doc. 50, Pltf. Depo. Exh. 122).

At some point, Judge Kubicki held a meeting with plaintiff and Veatch at which Judge Andrew West was present.  (Doc. 43, Veatch Depo. at 62-64, 93-94; Doc. 50, Pltf. Depo. at 378-79).  The meeting concerned the allegations Egner had made against Veatch and plaintiff.  (*Id.*; Doc. 45, Kubicki Depo. at 110).  Judge Kubicki informed plaintiff and Veatch that no finding would be made and no disciplinary action would be taken against them; however, he explained to

them what supervisory actions are appropriate and what supervisory actions are inappropriate when in receipt of a subordinate's complaint like that made by Egner. (Doc. 45, Kubicki Depo. at 100, 107-08, 110; Doc. 50, Pltf. Depo. at 375-79). Judge Kubicki directed them not to retaliate against Egner. (Doc. 43, Veatch Depo. at 64-65). He informed them that if Egner should approach them in the future with any issues, they should direct her to Ventre. (*Id*. at 68). Plaintiff was not disciplined as a result of Blandford's investigation of Egner's allegations against her and Veatch and nothing was placed in her personnel record. (Doc. 50, Pltf. Depo. at 379-80).

**F. ACPO position**

In the fall of 2010, there was a job posting for the position of Assistant Chief Probation Officer (ACPO) for the CCP. (Doc. 39, Ventre Depo. Exh. 13). The posting was created by Ventre and directed applicants to submit their letter of interest and resume to Walton by November 4, 2010. (*Id*.; Ventre Depo. at 146). As Probation Committee Chair, Judge Kubicki chose three individuals to be on an interview committee for the ACPO position: Krista Ventre, who Judge Kubicki described as his "go-to person in court administration"; Jerry Campbell, the Assistant Chief Probation Officer in Municipal Court; and Brian Urban, who was the highest ranking CCP supervisor. (Doc. 45, Kubicki Depo. at 47-48, 52-53; Doc. 39, Ventre Depo. at 153). The letters of interest were submitted to Walton, who passed them on to Ventre. (Doc. 39, Ventre Depo. at 146-47). Eight applicants submitted their resumes, including Veatch and plaintiff. (*Id*., Ventre Depo. Exh. 15).

Judge Kubicki had no involvement in the interview process beyond choosing the members of the interview committee and deciding with Ventre to interview all the applicants. (Doc. 45, Kubicki Depo at 84-85, 155-156; Doc. 40, Ventre Depo. at 272-74; Doc. 41, Campbell

Depo. at 72).  Judge Kubicki had no discussions with the other two members of the interview committee at any time during the interview process, and he did not discuss with either them or with Ventre the merits of any of the candidates or how to conduct the selection process.  (Doc. 45, Kubicki Depo. at 155-56; Doc. 41, Campbell Depo. at 72).  According to Ventre, she and Walton had occasionally discussed the vacancy and which individuals might possibly fill the position during the time the position was vacant and before the position was posted.  (Doc. 39, Ventre Depo. at 157-58).

The interview process was conducted as follows: Before the interview began, each applicant was given the same question and was allowed 15 minutes to prepare a written response, and the interview committee copied the written response and read it prior to the interview.  (Doc. 39, Ventre Depo. at 162; Ventre Depo. Exh. 16).  All interviewers received a copy of each applicant's resume and cover letter (Doc. 39, Ventre Depo. at 162; Ventre Depo. Exh. 16), as well as whatever additional materials the applicant had submitted with his or her letter of interest.  (Doc. 39, Ventre Depo. at 162).  All applicants were asked the same standard interview questions as well as some follow-up questions based on their responses.  (Doc. 39, Ventre Depo. at 164; Ventre Depo. Exh. 16).  After the interviews were concluded, the personnel file of each applicant, including performance evaluations, was reviewed.  (Doc. 39, Ventre Depo. at 163; Ventre Depo. Exh. 16).  Following the interviews, the three interviewers independently wrote down their top two choices for the position, with each selecting Joe Elfers as their first choice and Kevin Bonecutter as their second choice.  (Doc. 47, Urban Depo. at 17, 53).

After the interview committee chose its top two candidates for the position, it met with Judge Kubicki to inform him of the recommendation.  (Doc. 40, Ventre Depo. at 169, 171-72, 272-273; Doc. 45, Kubicki Depo. at 86; Doc. 41, Campbell Depo. at 71).  Judge Luebbers was

invited to the meeting by Judge Kubicki, and she joined the meeting while it was in progress. (Doc. 45, Kubicki Depo. at 86-87).  The interview committee explained its selections, the interview process, and how it had arrived at its decisions.  (Doc. 45, Kubicki Depo. at 88, 131-33; Doc. 41, Campbell Depo. at 63).  The interview committee's first choice was Elfers and the second choice was Bonecutter.  (Doc. 45, Kubicki Depo. at 116).

Judge Kubicki scheduled a meeting of the Probation Committee on November 30, 2010, for the Probation Committee to make a recommendation for the ACPO selection to the bench as a whole.  (Doc. 39, Ventre Depo. Exh. 18; Doc. 45, Kubicki Depo. at 116-117).  The  Probation Committee voted to recommend Elfers for the position.  (Doc. 45, Kubicki Depo. at 117-121).  A majority of the CCP judges signed the entry appointing Elfers as ACPO, and his appointment was effective December 6, 2010.  (*Id*. at 121; Doc. 39, Ventre Depo. Exh. 19).

### IV.  Defendants' motion to dismiss Hamilton County CCP is granted.

Defendants move to dismiss the complaint against the Hamilton County Court of Common Pleas on the ground this defendant is not *sui juris*.  (Doc. 52).  Plaintiff states in her memorandum in opposition to defendants' motion to dismiss/motion for summary judgment that she does not oppose dismissing the claims against the Hamilton County CCP.  (Doc. 57 at 5, n. 1).[1]  The Court will therefore grant defendant Hamilton County CCP's motion to dismiss as unopposed and dismiss Hamilton County CCP from the lawsuit.

### V.  The Court will exercise supplemental jurisdiction over plaintiff's state law claims.

Before turning to the resolution of plaintiff's discrimination and retaliation claims against defendants Walton and Judge Kubicki, the Court must address whether the exercise of supplemental jurisdiction over plaintiff's state law claims is appropriate.  As explained below,

---

[1] Page numbers referencing the parties' briefs are to the ECF page numbers appearing at the top of the page.

the Court grants summary judgment in favor of defendants on plaintiff's § 1983 claims. A district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007) (citing *Musson Theatrical v. Federal Express Corp.,* 89 F.3d 1244, 1254-55 (6th Cir. 1996)). Before deciding whether to retain jurisdiction over the state claims, the Court should "consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802-03 (6th Cir. 1996) (quoting *Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir. 1993)). The Court finds that the unique circumstances of this case counsel in favor of exercising jurisdiction over plaintiff's state law claims.

First, exercising supplemental jurisdiction over the state law claims would serve the interest of judicial economy. The parties have engaged in extensive discovery, this case is set for a final pretrial conference in less than a month, and the case is scheduled for trial before the undersigned in approximately one month. It would be more expedient to proceed in this Court rather than vacate these dates so close to trial and require the parties to begin anew in state court. In addition, the state law issues presented by this case are neither novel nor complex but are similar to issues raised by the § 1983 claims brought under federal law. In fact, the analysis for the § 1983 and state law discrimination claims is, in large part, identical. Finally, it likely would be necessary for the Hamilton County CCP judges to recuse themselves from this lawsuit brought against another CCP judge. Accordingly, the Court finds that the exercise of

17

supplemental jurisdiction is appropriate in light of the unique circumstances presented by this case.

### VI.  The motions for summary judgment are granted as to plaintiff's sex discrimination claims brought against defendants Walton and Judge Kubicki.

### A.  Sex discrimination claims under 42 U.S.C. § 1983 and Ohio Rev. Code Ch. 4112.

Plaintiff brings sex discrimination claims against defendants Walton and Judge Kubicki pursuant to 42 U.S.C. § 1983 and Ohio Rev. Code Ch. 4112.  Section 1983 provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law.  42 U.S.C. § 1983. Individuals have a right under the Equal Protection clause to the Fourteenth Amendment of the United States Constitution to be free from discrimination on the basis of sex in public employment.  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576-77 (6th Cir. 2004) (citing *Davis v. Passman,* 442 U.S. 228, 234-35 (1979)).  To establish such a claim, plaintiff must prove that she "suffered purposeful or intentional discrimination on the basis of gender." *Id*. at 577 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264-65 (1977)).  The showing a plaintiff must make to recover on an equal protection claim under § 1983 mirrors that which must be made to recover on a disparate treatment claim under Title VII.  *Id*. (citations omitted).  *See also Campbell v. Korleski*, No. 2:10-CV-1129, 2011 WL 2748641, at *8 (S.D. Ohio July 14, 2011) (citing *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir. 1988)).  Further, the same evidentiary standards and burdens of proof applicable to a claimed violation of Title VII apply to the analysis of an employment discrimination claim brought under Ohio Rev. Code Ch. 4112.  *Sigall-Drakulich v. City of Columbus*, 156 F. App'x 791, 795-96 (6th Cir. 2005) (citing *Mauzy v. Kelly Servs., Inc.,* 664 N.E.2d 1272, 1276 (Ohio 1996)).  Therefore, the district

court looks to federal case law governing Title VII actions when evaluating Ohio Rev. Code Ch. 4112 claims. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 538 (6th Cir. 1999).

Accordingly, this Court may evaluate both plaintiff's § 1983 and Ohio law claims under the law governing a Title VII claim. There is, however, one critical distinction between Title VII and Ohio law pertaining to the liability of individual supervisors and managers for their own discriminatory conduct occurring in the workplace environment. Under Title VII, an individual employee/supervisor may not be held personally liable unless he or she meets the definition of "employer" under 42 U.S.C. § 2000e(b). *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). Under Ohio Rev. Code Ch. 4112, individual liability is imposed on managers and supervisors for their own discriminatory conduct which violates Chapter 4112. *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 785 (Ohio 1999).

To prove a discrimination claim under Title VII, plaintiff must offer "direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864-65 (6th Cir. 2003). When a plaintiff alleges disparate treatment on account of her sex based on circumstantial evidence, her claim is analyzed under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* framework, the plaintiff must make out a prima facie case of discrimination. *Id.* at 802. *See Brown v. State of Tennessee,* 693 F.2d 600, 603 (6th Cir. 1982). "[T]o make out a *prima facie* [failure to promote] case the plaintiff must show that she belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered for and denied the promotion, and that other employees of similar qualifications who were not members of the

19

protected group were indeed promoted at the time the plaintiff's request for promotion was denied." *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 828-29 (6th Cir. 2000).

If the plaintiff establishes a prima facie case, the defendant must then offer some legitimate, nondiscriminatory explanation for its employment decision. *McDonnell Douglas Corp.,* 411 U.S. at 802.  If the defendant produces such an explanation, the plaintiff must show that the proffered reason was a pretext for unlawful discrimination. *Id*. at 804; *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009).  That is, she must point to sufficient evidence that could lead a reasonable jury to reject the defendant's proffered explanations. *Chen*, 580 F.3d at 400 (citations omitted).  "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *White v. Baxter Healthcare Corp*., 533 F.3d 381, 392 (6th Cir. 2008) (citing *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)).

"[B]ecause a prima facie case [of discrimination] and sufficient evidence to reject the employer's explanation may permit a finding of liability . . . a plaintiff [need not] always introduce additional, independent evidence of discrimination" to survive summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149 (2000).  Nonetheless, there are also "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* at 148.

### B.  Plaintiff's sex discrimination claims against defendants Walton and Judge Kubicki

Defendants Walton and Judge Kubicki do not dispute that plaintiff can establish a prima facie case of sex discrimination.  They concede that plaintiff is a member of a protected class; she applied for and was qualified for the position of ACPO; she was considered for and denied

20

the promotion to the position; and an individual of similar qualifications who was not a member of the protected class received the promotion plaintiff was denied.  (Doc. 52 at 16; Doc. 53 at 5-6).  However, defendants assert legitimate, nondiscriminatory reasons for the decision to promote Elfers and not plaintiff to the ACPO position, and they contend that plaintiff has not produced evidence of pretext.  Plaintiff contends that a reasonable jury could conclude that the reasons offered by defendants for the failure to promote plaintiff to the ACPO position were pretextual and the real reason was sex discrimination.

**1.  Liability for sex discrimination cannot be imposed on Walton based on his alleged gender bias and purported influence on the ACPO selection process.**

Defendant Walton contends that plaintiff's sex discrimination claims against him must be dismissed because plaintiff conceded at her deposition that Walton was not directly involved in the interview/selection process for ACPO.  (Doc. 52 at 30, citing Doc. 50, Pltf. Depo. at 315, 318-19, 321).  Walton argues that by failing to address this contention in her opposing memorandum, plaintiff has apparently conceded that Walton had no direct responsibility for the decision to deny the promotion to the ACPO position to plaintiff.  (Doc. 59 at 3).

Although plaintiff does not argue in her opposing memorandum that Walton directly participated in the allegedly discriminatory non-promotion decision, plaintiff alleges there is evidence which permits an inference that Walton's "attitude toward women influenced the selection process."  (Doc. 57 at 22-23).  Plaintiff alleges that a reasonable jury could conclude that as Court Administrator, Walton had created a discriminatory environment in the Probation Department in which it was difficult for women to advance.  (*Id*. at 19-22).  Plaintiff contends that a reasonable jury could further conclude that Walton influenced the interview/selection process because the interview committee members had interests aligned with his and connections

21

to him, and they were motivated by a desire to implement his "discriminatory agenda."  (*Id*. at 22-23).

In a case such as this, where a plaintiff challenges an adverse employment action as motivated by the discriminatory animus of a supervisor who is not the ultimate decisionmaker, the plaintiff can demonstrate discrimination by establishing a "'causal nexus' between the ultimate decision-maker's decision to [not promote] the plaintiff and the supervisor's discriminatory animus."  *Waggoner v. City of Battle Creek*, No. 1:12-CV-827, 2014 WL 1328167, at *3 (W.D. Mich. Mar. 28, 2014) (citing *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 350 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dept.,* 549 F.3d 666, 677 (6th Cir. 2008)).  *See also Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 946 (6th Cir. 1992).  A plaintiff can establish this nexus by presenting evidence of "cat's paw" liability, which exists when "a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action."  *Waggoner*, No. 1:12-CV-827, 2014 WL 1328167, at *3 (quoting *Staub v. Proctor Hosp.,* _ U.S. _, 131 S.Ct. 1186, 1194 (2011) (emphasis in original)).[2] *See also Smith v. Ohio Dep't of Pub. Safety*, 997 N.E.2d 597, 615 (Ohio 2013) (an employer may be held liable under the Ohio anti-discrimination laws under a "cat's paw" theory of liability.). "In the employment context, an unbiased decisionmaker is a cat's paw in situations where a biased subordinate, who lacks decisionmaking power, uses the unbiased decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory or retaliatory employment action."  *Id*. (quoting *BCI Coca-Cola Bottling Co*., 450 F.3d at 484).  Plaintiff can establish cat's paw liability in the

---

[2] The term "cat's paw" is derived from an Aesop's fable in which a monkey induces a cat to extract roasting chestnuts from a fire, after which the monkey absconds with the chestnuts and leaves the cat with burned paws and no chestnuts.  *Staub*, 131 S.Ct. at 1190, n. 1 (citing *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir. 1990)).

employment context by showing that the ultimate decisionmakers relied on discriminatory information provided by a supervisor and thereby "acted as the conduit of [the supervisor's] prejudice - his cat's paw." *Kanungo v. Univ. of Kentucky*, 1 F. Supp.3d 674 (E.D. Ky. 2014) (quoting *Madden,* 549 F.3d at 678) (internal quotation marks omitted).

The United States Supreme Court in *Staub* explained the cat's paw theory as follows in the context of an employee termination based on an earlier disciplinary warning of a supervisor who was not the ultimate decisionmaker:

> So long as the earlier agent intended, for discriminatory reasons, that the adverse [employment] action occur, he has the scienter required for [] liability. Moreover, it is axiomatic under tort law that the decisionmaker's exercise of judgment does not prevent the earlier agent's action from being the proximate cause of the harm[.]
> . . . .
>
> [I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]."

*Staub,* 131 S.Ct. at 1192, 1194 (emphasis in original).

Here, plaintiff seeks to hold Walton liable for the alleged discriminatory decision to deny her the promotion to ACPO under a slightly modified cat's paw theory; that is, the interview committee, which recommended the individuals for the ACPO position, acted as the "cat's paw" for Walton. Plaintiff does not allege that the members of the interview committee who recommended Elfers for the ACPO position were themselves motivated by a discriminatory animus to deny plaintiff the position. Rather, plaintiff alleges that (1) Walton, in his capacity as Court Administrator, was motivated to deny plaintiff the ACPO position based on his own anti-female bias, which is evidenced by the discriminatory environment he created in the Probation Department during his tenure as Court Administrator; and (2) Walton influenced the interview committee to deny plaintiff the ACPO position consistent with his discriminatory motivation.

23

Plaintiff has not introduced evidence to support a causal connection between the decisions of the members of the interview committee and Walton's alleged discriminatory animus.  First, plaintiff has not introduced evidence to show that Walton harbored a discriminatory bias against females and that he was motivated to deny plaintiff the ACPO position for this reason.  Plaintiff makes a number of allegations in an attempt to establish that Walton had a discriminatory animus against females in general and against her in particular based on her gender.  However, plaintiff's allegations are not supported by the evidence she cites.

First, plaintiff alleges that Walton operated the Probation Department as a "boys' network" wherein he showed favoritism to males, particularly those within his "core group." (Doc. 57 at 20, citing Doc. 51, Clancy Depo. at 198).  Specifically, plaintiff alleges that Elfers, a male, was permitted to "show his disdain" for working with female officers based on a "paternalistic notion" that he would have to take care of them if something happened.  (Doc. 57 at 20, citing Doc. 46, George Depo. at 13-16).  However, George's testimony does not support the proposition for which plaintiff cites it.  George testified that Elfers did not want to work with her, but she did not know if this was because of her gender; she simply knew Elfers did not like her.  (Doc. 46, George Depo. at 22-24).  Moreover, George testified that Elfers did routinely work in the field with a different female ISP officer, Kathy Horn.  (*Id*. at 83-84; *see also* Doc. 42, Shannon Depo. at 41).  Further, plaintiff has not shown a connection between George's testimony concerning Elfers' refusal to work with her and any alleged discriminatory conduct or animus by Walton.  George testified that she did not think Walton was even aware of her situation with Elfers.  (Doc. 46, George Depo. at 16-17).  Further, George testified that while she felt the Probation Department was a "male's club," she could not attribute Walton's attitudes to

24

sexism and she could not say that Walton ever displayed a hostile attitude toward either George or plaintiff because of their gender. (*Id*. at 21-24). Thus, George's vague allegations that Elfers was hostile toward her are too conclusory and too distinct from any conduct of Walton to be relevant to plaintiff's claims. *Cf. Schrack v. RNL Carriers, Inc.,* 565 F. App'x 441, 446 (6th Cir. 2014) (rejecting other employees' testimony of prior bad acts where the alleged bad actors were different; the allegations were "too vague and conclusory" to determine if the nature of the claims was similar; and the employees were not similarly situated to the plaintiff); *Megivern v. Glacier Hills Inc.,* 519 F. App'x 385, 400-01 (6th Cir. 2013) (experiences of non-party employees identified by the plaintiff as having been subjected to discrimination by the defendant "present[ed] factually distinct circumstances from [the plaintiff's] case" and therefore did not support a finding of pretext).

As further evidence of Walton's alleged discriminatory animus, plaintiff alleges that Walton created a group of substations, an individual unit within the CCP, which routinely received favorable treatment but contained no women in supervisory positions, and at one point he removed female officers from the substations altogether. (Doc. 57 at 20, citing Doc. 46, George Depo. at 20-21; Doc. 51, Clancy Depo. at 16-17). However, Clancy's testimony on this issue is speculative, as Clancy testified she was "assuming" Walton was involved in choosing who the supervisors of the substations were and she believed Walton and Urban had a preference to place males in charge of the substations because "that's just how they operated," "that's what they wanted to do," and "they wanted to promote [their friends] in any way that they could." (Doc. 51, Clancy Depo. at 17-18). Clancy testified that in "[her] opinion," the substations "were like a little old boys network, basically," but the specific examples she provided do not evince a discriminatory animus on the part of Walton. (*Id*. at 18). Clancy testified that the substations

received preferential treatment in terms of uniforms, job assignments, use of county cars, and discipline, yet Clancy does not connect any of the alleged preferential treatment to gender. (Doc. 51, Clancy Depo. at 22-32). For example, Clancy testified that Walton would "run interference" for substation probation officers who were threatened with disciplinary action. (*Id*. at 32). The specific instance cited by Clancy involved a *female* substation probation officer, not a male probation officer, which does not support the notion that Walton harbored an anti-woman bias. (*Id*.). Further, Clancy testified that although she expressed many concerns about the substations, she does not remember if she specifically expressed any concerns about gender. (*Id*. at 19). George testified that Walton "obviously" moved female officers out of the substations, which she "think[s]" he did "on the advice of the other officers out there" and which she "think[s]" was a manifestation of a gender issue. (Doc. 46, George Depo. at 20-21). However, George never complained that her opportunities in the Probation Department were being compromised due to this situation because she "just didn't think [Walton] liked" her and she did not think she was "part of the group," an attitude which George could not necessarily attribute to her gender. (*Id*. at 21-23). Moreover, the evidence shows that as of July 2009, during Walton's tenure as ACPO, three women were serving as substation officers. (Doc. 47, Urban Depo. Exh. 96). There is no evidence that these women were moved out of their positions by Walton or any other supervisor.

In addition, plaintiff relies on Clancy's belief that there was a preference for male probation officers and that it would be difficult for plaintiff to advance as long as Walton was in charge because plaintiff "was in the same boat as far as, you know, obviously being female and her treatment." (Doc. 57 at 20, citing Doc. 51, Clancy Depo. at 198, 200). This testimony is much too vague and conclusory to permit an inference that Walton was motivated to discriminate against women.

26

Plaintiff further alleges that her own experience in the Probation Department is evidence of Walton's bias against women.  (Doc. 57 at 20-21).  She notes that Walton testified that but for a directive from Judge Ruehlman, Walton would not have recommended to other judges that plaintiff be promoted to ISP Director in 2006.  (Doc. 48, Walton Depo. at 46-50).  Walton testified that he did not think plaintiff should be promoted to the position because she was not the best person for the job.  (*Id*. at 50).  Plaintiff offers no evidence that calls into question the veracity of Walton's testimony.  To the contrary, Judge Ruehlman has acknowledged that plaintiff may not have been the most qualified applicant for the position.  (Doc. 52-1, Ruehlman Aff., ¶ 6).  Judge Ruehlman has stated that he nonetheless "pushed through" plaintiff's application based on his friendship with her and because she had worked on campaigns.  (*Id.*).  In view of the evidence that plaintiff's 2006 promotion was based on considerations other than her qualifications, Walton's testimony that he would not have recommended plaintiff for ISP Director in 2006 absent a directive from Judge Ruehlman is not indicative of an anti-female bias on Walton's part.

Plaintiff further alleges that Walton showed his anti-female bias by marginalizing her once she accepted the 2006 promotion to ISP Director.  (Doc. 57 at 21).  Plaintiff alleges that Walton marginalized her by removing her ability to hire and supervise a portion of the ISP personnel and allowing the substations to spend money allocated to the ISP program, thereby making it nearly impossible for her to meet the standards of an already struggling program.  (*Id.*, citing Doc. 43, Veatch Depo. at 18-19, 24-27).  Plaintiff alleges that Walton further marginalized her by failing to include her in the Lausten investigation and by not inviting her to participate in a State presentation regarding the status of the ISP program.  (Doc. 50, Pltf. Depo. at 136-37, 229).  However, plaintiff has not connected any of these actions to her gender.  In fact, Ventre

testified that she conducted the Lausten investigation and it was her decision to not include plaintiff.  (Doc. 40, Ventre Depo. at 252).  Plaintiff testified that she was not present for the 2009 State presentation to the Court, but she does not allege that Walton decided who would be invited to the presentation.  (Doc. 50, Pltf. Depo. at 136-37).  Veatch testified that although the ISP grant mandated that the ISP Director be involved in the hiring of new personnel, there were times when plaintiff was told who would be hired and there was not any input from her of which he was aware.  (Doc. 43, Veatch Depo. at 18-19).  Veatch also testified that the substations were put under the ISP grant, which he "assume[d]" was at Walton's directive, and that it hurt plaintiff's ability to administer the program.  (*Id*. at 21-25).  However, Veatch provided no specific testimony which permits an inference that Walton "marginalized" plaintiff in her role as ISP Director because she is a woman.

Finally, plaintiff argues that evidence offered by defendants that some women were promoted during Walton's tenure as Court Administrator is insufficient to counter evidence that Walton harbored negative views about female probation officers.  Plaintiff notes that only three of the seven women named by defendants as having been promoted during Walton's tenure were members of the Probation Department, and she argues that the fact that some women received promotions is not dispositive of whether plaintiff was the victim of unlawful discrimination.  (Doc. 57 at 21-22, citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 720 (6th Cir. 2006) ("An employer does not have to discriminate against all members of a class to illegally discriminate against a given member of a class.")).  Plaintiff's argument is true as far as it goes.  However, while not dispositive of plaintiff's claim of gender bias, evidence that several women were promoted to management positions during Walton's tenure as Court Administrator does

refute testimony offered by plaintiff to show women were unlikely to advance so long as Walton was Court Administrator.

Thus, considered as a whole, the evidence submitted by plaintiff is insufficient to demonstrate that Walton "intend[ed], for discriminatory reasons, that the adverse [employment] action occur." *Staub,* 131 S.Ct. at 1192. There is no evidence to show that Walton had "the scienter required to be liable" under the anti-discrimination laws for the decision that plaintiff not be promoted to ACPO. *Id.*

Further, assuming Walton harbored a discriminatory animus against plaintiff, there is no evidence to support a finding that the interview committee in this case "acted as the conduit of [Walton's] prejudice." *Kanungo*, 1 F. Supp.3d 674 (quoting *Madden,* 549 F.3d at 678). To demonstrate there was a causal nexus between Walton's purported discriminatory bias and the outcome of the interview/selection process, plaintiff points to evidence which permits an inference that Walton knew the identities of at least some of the applicants for the ACPO position. (Doc. 57 at 22). Specifically, the job posting for ACPO directed applicants to send their letters of interest and resumes to Walton (*Id.*, citing Doc. 39, Ventre Depo. Exh. 13), Ventre testified at her deposition that she believed Walton had collected at least some of the resumes (Doc. 39, Ventre Depo. at 146), and the cover letters submitted by some applicants were addressed to Walton. (*Id.*, citing Doc. 39, Ventre Depo. Exhs. 21, 22; Doc. 43, Veatch Depo. Exh. 59). Plaintiff further contends there is circumstantial evidence that would permit a reasonable jury to doubt the testimony provided by Ventre, Urban and Campbell that Walton had no influence on the decision to promote Elfers to the ACPO position over plaintiff. (Doc. 57 at 23). Specifically, plaintiff contends that a reasonable jury could find that Walton influenced the interview committee's decision based on the following evidence: (1) testimony by Patricia

Clancy, who served as ACPO from October 2007 until the end of 2009, that Campbell had a "very close" professional relationship with Walton, Campbell reported directly to Walton, he was Walton's "right-hand man," and he was part of a "boys network" in the Probation Department, as was the candidate ultimately selected for the ACPO position, Elfers (Doc. 51, Clancy Depo. at 9, 197-98); (2) Clancy's testimony that Urban, the supervisor of the substations, reported directly to Walton, was "afforded extraordinary powers above everybody else in probation," and was also part of the "boys' network" (*Id*. at 16, 196-97); and (3) evidence that although not a member of the Probation Department, Ventre was the Court's Personnel Director, she reported directly to Walton, and before the ACPO position was posted and the interview committee met, she had discussed with Walton who they each believed would apply for the ACPO position and who would be a good fit for the job. (Doc. 39, Ventre Depo. at 152, 156-57). Plaintiff argues that "it stretches reality to believe that Campbell and Urban did not make an ACPO selection that would be consistent with Walton's wishes considering he was a close ally to both of them in the Probation Department." (Doc. 57 at 23). Plaintiff contends the Court should therefore "reject Defendants' argument that any discriminatory agenda Walton may have had was obviated by his alleged lack of participation in the selection process." (*Id*.).

The circumstantial evidence offered by plaintiff is insufficient to show that Walton influenced the interview committee's ACPO recommendation decision, or that he intended to exert any influence on the committee. Walton testified unequivocally at his deposition that he had no involvement in the decision to promote Elfers to the ACPO position and he was not involved in the selection process. (Doc. 48, Walton Depo. at 31-35, 64). Walton's testimony is consistent with the deposition testimony of the three individuals on the interview committee, each of whom testified that Walton never spoke to them during the course of the application

30

process about their roles in selecting the ACPO or about whom he wanted to fill the position. (Doc. 41, Campbell Depo. at 60-61, 72; Doc. 39 Ventre Depo. at 158-59; Doc. 40, Ventre. Depo. at 269-71; Doc. 47, Urban Depo. at 42). Plaintiff has not submitted any evidence to refute their testimony or to create a genuine issue of fact on whether Walton influenced the interview committee members. Plaintiff points to testimony that Walton may have commented or given his opinion to Ventre prior to the posting of the ACPO position regarding how he thought plaintiff would perform in the position. (Doc. 39, Ventre Depo. at 157-58). However, there is no evidence that Walton offered his opinion either after the job was posted or after Ventre was selected for the interview committee. (*See* Doc. 40, Ventre Depo. at 269-70). The remaining evidence offered by plaintiff is pure conjecture and is not persuasive evidence that Walton was involved in the ACPO selection decision. Plaintiff must rely on more than speculation and conjecture to refute the testimony of Walton and each of the members of the interview committee and to create a genuine issue of material fact as to whether Walton intentionally influenced the committee members' decision. *See Matsushita*, 475 U.S. at 586 (the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing [a motion for summary judgment] may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." (internal quotation marks omitted); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (emphasis in original). Plaintiff has not come forward with specific evidence sufficient to refute the testimony of Walton and the three members of the interview

committee and create a factual question as to whether Walton had any involvement in the ACPO selection decision, and whether he intended to influence the outcome of the selection process based on a discriminatory motive.

For these reasons, plaintiff cannot prevail on her sex discrimination claims brought against defendant Walton. Plaintiff concedes defendant Walton had no direct involvement in the adverse employment decision, and there is no evidence that defendant harbored a discriminatory animus that could be imputed to the interview committee. There is not a scintilla of evidence showing that Walton had any input into the interview process, the interview committee's recommendation, or any other facet of the selection process. Defendant Walton is entitled to summary judgment on plaintiff's sex discrimination claims brought under 42 U.S.C. § 1983 and Ohio law.

**2. Judge Kubicki is entitled to summary judgment on plaintiff's sex discrimination claims.**

Plaintiff has failed to introduce any probative evidence to support a sex discrimination claim against Judge Kubicki. Indeed, all of the evidence introduced by plaintiff is directed toward the allegedly discriminatory environment in the Probation Department created by Walton because of his alleged bias against women and whether this bias influenced the selection process for the ACPO position. (Doc. 57 at 19-23). Plaintiff has not presented any argument or evidence supporting an inference that Judge Kubicki harbored a gender bias against women or created a discriminatory atmosphere in the Probation Department. Because plaintiff seeks to hold Judge Kubicki personally liable for her failed promotion, it is incumbent upon plaintiff to present probative evidence of gender discrimination by Judge Kubicki to create a genuine issue of fact for trial. In the absence of any such evidence, Judge Kubicki is entitled to summary judgment on

plaintiff's sex discrimination claims brought against him in his individual capacity under § 1983 and Ohio law.[3]

Further, plaintiff's § 1983 claim against Judge Kubicki in his official capacity as the Presiding Judge of the Hamilton County CCP must be dismissed on the additional ground that plaintiff has not made any arguments and has not produced any evidence that a County policy or custom played a part in the alleged violation of her equal protection rights. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citations omitted) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" and the entity's "policy or custom" must have played a part in the violation of federal law.). Judge Kubicki is entitled to summary judgment on plaintiff's sex discrimination claim brought against him in his official capacity.

### 3. Plaintiff has failed to introduce sufficient evidence of pretext.

Defendants Walton and Judge Kubicki are entitled to summary judgment on plaintiff's sex discrimination claims brought against them in their individual capacities for the additional reason that plaintiff has failed to carry her burden of production under the *McDonnell-Douglas* framework. Defendants have asserted a number of legitimate nondiscriminatory reasons for the decision to deny plaintiff a promotion to the ACPO position. Plaintiff may show pretext by

---

[3]Plaintiff's recitation of the facts suggests that Judge Kubicki purposely selected an interview committee closely aligned with Walton so the committee would carry out Walton's desire to deny plaintiff the ACPO promotion. (Doc. 57 at 15-16). Plaintiff cites to evidence that Walton considered Judge Kubicki to be the best Presiding Judge he had ever worked under (Doc. 48, Walton Depo. at 29); Judge Kubicki and Walton were generally viewed by courthouse personnel to be "close" (Doc. 43, Veatch Depo. at 71); and the individuals on the interview committee were in turn closely aligned with Walton. (Doc. 51, Clancy Depo. at 197; Doc. 46, George Depo. at 34, 47). (Doc. 57 at 15-16). However, deposition testimony that Judge Kubicki and Walton had a "close" relationship according to the courthouse "rumor mill," and that Walton and some members of the interview panel had close professional relationships, does not support an inference that Judge Kubicki intentionally discriminated against plaintiff based on her gender. This evidence does not permit a reasonable fact-finder to infer that Judge Kubicki selected Ventre, Campbell and Urban for the interview committee not for the reasons he stated, but because he knew these individuals would be subject to influence by Walton to deny plaintiff the ACPO promotion because she is a female. The inferences plaintiff seeks to create are no more than speculation and conjecture and are insufficient to create a genuine issue of material fact. *See Ross*, 402 F.3d at 588.

demonstrating: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." *Davis v. Cintas Corp.*, 717 F.3d 476, 491-92 (6th Cir. 2013) (quoting *Hedrick v. Western Reserve Care Sys.,* 355 F.3d 444, 460 (6th Cir. 2004); *Chen,* 580 F.3d at 400). This test is a flexible one, and "it is important to avoid formalism in its application, lest one lose the forest for the trees. Pretext is a commonsense inquiry: did the employer fire [or, as here, refuse to promote] the employee for the stated reason or not?" *Id*. at 492 (quoting *Chen,* 580 F.3d at 400 n. 4.).

The Sixth Circuit has typically grouped the first and third pretext tests together because they are both "direct attacks on the credibility of the employer's proffered motivation for [not promoting the employee] and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). The second test "is of an entirely different ilk" because "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Id*. (quoting *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original) (*overruled on other grounds by Gross v. FBL Financial Services, Inc.,* 557 U.S. 167 (2009)).

For the reasons discussed below, plaintiff has failed to carry her burden of establishing pretext.

### i. Plaintiff's qualifications for the ACPO position

To establish pretext, plaintiff maintains that she was at least as qualified as, or better qualified than, Elfers for the position of ACPO. (Doc. 57 at 24-26). Specifically, plaintiff had

34

14 years' experience as a supervisor in the Probation Department, she had four years' experience as ISP supervisor, and she had supervised a number of people in different units; in comparison, Elfers had been a supervisor with the Probation Department since 2007, he had supervised only one to two people, and "to [Veatch's] knowledge," Elfers had no experience writing grants and performing other administrative tasks that did not have to be performed in the substations. (*Id.*, citing Doc. 39, Ventre Depo. Exhs. 19, 21, 22; Doc. 43, Veatch Depo. at 74-75).

Typically, an employer is given wide leeway in determining relevant hiring criteria, particularly when selecting management personnel. *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006). Under some circumstances, evidence that the plaintiff was more qualified than the successful applicant can be sufficient to raise a genuine issue of material fact that the employer's proffered explanation is pretextual. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391-92 (6th Cir. 2009) (citations omitted). "Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the [successful applicant over the plaintiff], or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination.'" *Bartlett v. Gates*, 421 F. App'x 485, 490-91 (6th Cir. 2010) (citing *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 627-28 (6th Cir. 2006)); *see also Risch,* 581 F.3d at 392 (when the plaintiff offers "other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment."); *Jenkins v. Nashville Pub. Radio,* 106 F. App'x 991, 995 (6th Cir. 2004) (reversing summary judgment in favor of employer where employee offered evidence of superior qualifications and "some evidence of irregularities in the

35

application and selection process, inconsistencies in the reasons given by [her employer] for not hiring her, and the lack of African-American women in supervisory positions at [her employer]").

The Court in *Risch* found that the defendant was not entitled to summary judgment where the record demonstrated that the plaintiff had arguably superior qualifications than either of the two successful male applicants, and the record contained additional probative evidence of pretext. Specifically, the record indicated that male officers in the department "frequently made degrading comments regarding the capabilities of female officers, expressed the view that female officers would never be promoted to command positions, and made generally degrading remarks about women." *Id*. at 392. The Sixth Circuit stated that discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext and explained the relevance of such discriminatory remarks as follows:

> Although discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a nondecisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add "color" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Id.* (citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 356 (6th Cir. 1998) (internal quotation marks and citations omitted)). Evidence of a discriminatory atmosphere need not "coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment" in order to be relevant. *Id.* (citing *Ercegovich*, 154 F.3d at 356) (internal quotation marks omitted).

36

Unlike *Risch*, the evidence here does not establish that plaintiff was the plainly superior candidate for the ACPO position by virtue of her qualifications.  581 F.3d at 392.  *See also Bartlett*, 421 F. App'x at 490-91.  Both plaintiff and Elfers had supervisory experience, and although plaintiff had been a supervisor longer, Elfers had several more years of total service with the Probation Department, having begun his employment there in 1983.  (Doc. 39, Ventre Depo. Exh. 21).  In addition, although plaintiff had more years of service in a supervisory position than did Elfers, as explained more fully below, one could reasonably conclude she had not performed particularly well as a supervisor as demonstrated by serious issues with officers under her supervision and problems documented by the Ohio agency charged with oversight responsibility.  Moreover, plaintiff has not introduced evidence to show that grant writing was a function of the ACPO position or that experience in this area was a qualification for the position, nor that specific experience performing administrative tasks outside of the substations made her better qualified for the position.

In addition, for the reasons discussed below, the record does not contain "other probative evidence of pretext."  *See Bartlett*, 421 F. App'x at 490-91 (citing *Bender*, 455 F.3d at 627-28).  Accordingly, plaintiff's qualifications as compared to those of Elfers, when considered with the remaining factors which the interview committee took into account in making its recommendation, are not evidence of pretext.

### ii. ISP Program performance under plaintiff's supervision

Defendants assert that in making its promotion recommendation, the interview committee took into account indications that the ISP unit was not performing well under plaintiff's supervision as compared to other counties in the State.  They allege that although the Hamilton County ISP unit was receiving more state money than any other county in the State of Ohio, its

recidivism rate was the worst in the State, and in 2009 the ODRC threatened to reduce the unit's funding if it did not increase its effectiveness.  (Doc. 52 at 16-17).

Plaintiff contends there are genuine issues of fact as to whether the performance of the ISP program was a sufficient justification for not promoting her to ACPO.  Plaintiff concedes there were issues with the program's performance but alleges the program was struggling as early as 2004, long before she became the program's director; there were issues with getting the CCP judges to use the program; and Walton "marginalized her" and created additional challenges once she became ISP Director by removing her ability to hire and supervise a portion of the ISP personnel and by allowing the substations to spend money allocated to the ISP program.  Plaintiff thus contends that a reasonable jury could find that "[d]efendants created the very problem on which they now attempt to rely as justification for her non-promotion."  (Doc. 57 at 29).  Plaintiff also alleges that Ventre's deposition testimony calls into question whether defendants' reliance on the ISP program's performance was pretextual.  (Doc. 57 at 30). Plaintiff asserts that although Ventre testified that the 2009 State report indicated that Hamilton County was not functioning well compared to other counties, including in the area of success rates, at her deposition she demonstrated unfamiliarity with what a success rate was or how it was calculated.  (Doc. 57 at 29-30, citing Doc. 39, Ventre Depo. at 223-24).  Plaintiff further contends that if the ISP program's success rate had been a critical factor in the promotion decision, Ventre likely would have looked into the issue of whether the ISP program's statistics were improving in the year between the 2009 presentation by Galli, the State's Assistant Chief for the Bureau of Community Sanctions, and the interview process, but she failed to do so.  (*Id*. at 30, citing Doc. 39, Ventre Depo. at 231-32).

Plaintiff has not introduced evidence to create a genuine issue of fact as to whether the poor performance of the ISP program under her direction was sufficient to motivate the decision to deny her the ACPO position.  Although there may have been certain factors beyond plaintiff's control that impacted the success of the ISP program, the individuals involved in the ACPO selection decision were entitled to look at plaintiff's past performance as ISP Director to determine whether she should be given even greater responsibility as ACPO.  *See Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 345 (6th Cir. 2006) (poor performance can justify an adverse employment action so long as the employer "reasonabl[y] reli[ed] on the particularized facts that were before it" at the time the adverse employment decision was made) (quoting *Smith v. Chrysler Corp.,* 155 F.3d 799, 806-07 (6th Cir. 1998)).  An employee's view of her own satisfactory performance cannot establish pretext "where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor."  *Id*. (citing *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1116-17 (6th Cir. 2001)).  Insofar as plaintiff alleges defendants created the problems with the ISP program on which they relied to justify her non-promotion (Doc. 57 at 29), plaintiff has not produced any evidence to show that either defendant attempted to undermine her performance as ISP director based on her gender. Further, to the extent plaintiff attempts to cast doubt on Ventre's assertion that she relied on the past performance of the ISP program as a selection factor, the evidence plaintiff cites is not sufficient to create an issue of fact as to Ventre's true motivation.  Ventre testified that based on Galli's 2009 presentation, she understood that the ISP program was not functioning well as compared to other counties, Hamilton County was in danger of losing its funding for the program, and the County "was at the low end of success rates."  (Doc. 39, Ventre Depo. at 223-24).  Notably, plaintiff does not present evidence disputing the accuracy of these conclusions,

and Ventre could reasonably draw these conclusions from the information presented by the Ohio agency. Neither Ventre's inability to define "success rate" as used in the 2009 report, nor her failure to investigate in her capacity as CCP Personnel Director whether the rate improved after 2009, is probative of pretext. The evidence cited by plaintiff does not create a genuine issue of material fact as to whether the poor performance of the ISP program under her supervision was sufficient to motivate the decision to deny her the promotion to ACPO and was a pretext for sex discrimination.

### iii. The Lausten/Moxley investigation

Defendants posit as an additional non-discriminatory reason for the failure to promote plaintiff to ACPO the 2009 investigation of Dick Lausten, a Probation Officer under the supervision of ISP Probation Officer Supervisor Thomas Moxley. (Doc. 52 at 17-19). The investigation by Ventre included a pre-disciplinary hearing conducted by Campbell (Doc. 41, Campbell Depo. at 39), and culminated in Lausten's indictment on seven counts of using the Regional Computer Information Center (RCIC) for personal purposes in violation of Ohio law (Doc. 50, Pltf. Depo. Exh. 114), and his termination in May 2010 by entry of the Hamilton County CCP judges for incompetency, discourteous treatment of the public, neglect of duty, violation of the court's policy, failure of good behavior, misfeasance, malfeasance, and nonfeasance. (*Id.*, Depo. Exh. 115). Campbell also conducted a pre-disciplinary hearing for Moxley (Doc. 41, Campbell Depo. at 43-45), and it was determined that Moxley was not adequately supervising Lausten and either was not performing audits or was overlooking deficiencies. (Doc. 52 at 18, citing Campbell Depo. at 35-36). Moxley resigned in August 2010 while the Probation Committee was deciding whether to discipline Moxley and, if so, what his discipline should be. (Doc. 52 at 19, citing Doc. 45, Kubicki Depo. at 151-52; Doc. 50, Pltf.

Depo. at 259).  Ventre testified at her deposition that in making the ACPO decision, she

considered that plaintiff, as Director of the unit, had a Probation Officer and Probation Officer

Supervisor under her supervision who were not performing their jobs and plaintiff failed to

address the issue.  (Doc. 39, Ventre Depo. at 210, 219-20).  Campbell testified that he also took

the investigations into account and was surprised that plaintiff would apply for the ACPO

position when an investigation a few months earlier had revealed that a Probation Officer in her

unit was performing so "horrendously" and the Probation Officer's supervisor, who reported to

plaintiff, was not doing his job at all.  (Doc. 41, Campbell Depo. at 32-33, 35-36).  Campbell was

of the opinion that plaintiff had exercised little oversight, she had failed to have the foresight to

see that people under her supervision were not doing a good job, and she had not reacted to this

situation which had happened under her watch.  (*Id*. at 32).  Urban testified that he likewise

believed the results of the Lausten/Moxley investigation did not warrant plaintiff's promotion to

ACPO of an entire unit.  (Doc. 47, Urban Depo. at 26, 32-33, 48-49).

        Plaintiff alleges that the termination of Lausten for failure to carry out his duties as

Probation Officer is insufficient to warrant summary judgment and there is a question of fact as

to whether her handling of the incident constitutes a gross neglect of duty sufficient to warrant

non-promotion.  (Doc. 57 at 30-31).  Plaintiff contends that Lausten had been a long-time

employee of the Probation Department at the time of his termination and by his own account had

been carrying out his duties in the manner that led to his termination throughout his tenure.[4]  (*Id*.

at 30, citing Doc. 41, Campbell Depo. Exh. 35).  Plaintiff alleges that Urban substantiated

Lausten's assertion by testifying that even in the years before plaintiff was ISP Director, Lausten

---

[4] Plaintiff incorrectly asserts that Lausten had been performing his job in the same unprofessional manner for 35 years without intervention by any supervisor.  In fact, according to Lausten's Pre-Disciplinary Conference Summary prepared by Campbell, Lausten stated "he had been doing his job the same way for the past *11 years* and no one told him he was doing anything wrong."  (Doc. 41, Campbell Depo. Exh. 35 at CCP311) (emphasis added).

had a reputation for "fairly egregious" omissions such as not making home visits and neglecting to see probationers for one year.  (*Id.* at 31, citing Doc. 47, Urban Depo. at 34).  Urban testified that although he experienced such deficiencies with Lausten in multiple cases, he elected not to take action until 2009.  (*Id.*, citing Doc. 47, Urban Depo. at 34).  Plaintiff further asserts that Veatch testified that in his opinion, plaintiff was not responsible for Lausten's failings and he did not know what plaintiff could have done to avoid the situation.  (Doc. 43, Veatch Depo. at 36-37).  Further, plaintiff notes that the Hamilton County CCP judges elected not to discipline her under the progressive discipline policy for Lausten and Moxley's deficiencies.  (Doc. 39, Ventre Depo. at 256).

Plaintiff has not produced evidence to show that consideration of the Lausten/Moxley issues was a pretext for unlawful discrimination.  Plaintiff asserts that "whether the Lausten incident was a gross neglect of duties sufficient to warrant non-promotion" is a quintessential question of fact appropriate for a jury.  (Doc. 57 at 31).  The Court disagrees.  The fact that two employees under plaintiff's supervision had been derelict in the performance of their duties is a sufficient justification for the decision to not promote plaintiff into a supervisory position with even greater responsibility.  Plaintiff has not introduced evidence to call into question the credibility of the asserted justification.  Plaintiff notes that Urban did not take action to rectify the Lausten situation.  Urban did not have supervisory responsibility over Lausten; yet, he brought Lausten's nonfeasance to plaintiff's attention shortly after she became ISP Director in 2006.  (Doc. 47, Urban Depo. at 33-36).  Moreover, the fact that plaintiff was not disciplined over the Lausten and Moxley incidents is not probative of pretext.  At least two judges on the Probation Committee, Judge Ethna Cooper and Judge Steven Martin, favored exploring the possibility of disciplinary action against plaintiff.  (Doc. 48, Walton Depo. at 87-88).  Plaintiff

was aware that at least some of the Hamilton County CCP judges were considering whether discipline was appropriate for her. (Doc. 50, Pltf. Depo. at 259-260). Although discipline ultimately was not imposed, the fact that some judges thought discipline might be warranted indicates the seriousness of the oversight lapses. Thus, considered as a whole, the evidence plaintiff has produced does not raise a genuine issue of fact as to whether the decisionmakers' reliance on the Lausten/Moxley matter was a pretext for unlawful discrimination.

### iv. Subjective considerations

Plaintiff alleges that a reasonable jury could conclude that defendants' assertions regarding Elfers' alleged superior performance during the interview process are nothing more than self-serving, subjective assertions designed to mask intentional discrimination that occurred during the selection process. (Doc. 57 at 26-28).

The Sixth Circuit has recognized that employers "are entitled to 'greater flexibility' in management-level employment decisions." *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (citing *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)). "[The Court does] not 'act[] as a super personnel department, overseeing and second guessing employers' business decisions.'" *Id.* (quoting *Bender,* 455 F.3d at 627). However, the Sixth Circuit has also cautioned that "decisions made on the basis of subjective criteria, such as whether an employee is an effective manager, can provide a ready mechanism for discrimination, and thus such decisions are carefully scrutinized." *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 504 (6th Cir. 2011) (internal quotation marks omitted); *Hedrick*, 355 F.3d at 461.

Here, plaintiff has not shown that subjective considerations were a pretext for gender discrimination. To support her contention, plaintiff asserts that she was not on equal footing during the interview process because although the job posting asked applicants to submit their

letters of interest and resumes (Doc. 39, Ventre Depo. Exh. 13), Elfers submitted numerous

letters of recommendation from the community and no other applicant was given this

opportunity. (Doc. 57 at 26-27, citing Doc. 39, Ventre Depo. 168-69). In fact, however, there

was no bar to other candidates submitting additional materials with their applications. Further,

the cases plaintiff cites to show that Elfers' submission of additional materials and consideration

of the materials by the interview committee is evidence of pretext do not support plaintiff's

position. Those cases involved either blatant irregularities in the application process or evidence

that the process had been rigged to favor a certain candidate for discriminatory reasons. *See*

*Jenkins,* 106 F. App'x at 994 (record included evidence of "irregularities in the process of

posting the position and entertaining applications for it," including extension of the application

deadline and the defendant's admission that the decision to hire an applicant had already been

made by the time a "courtesy interview of plaintiff" was held); *Kimble v. Wasylyshyn*, 439 F.

App'x 492, 500 (6th Cir. 2011) (evidence of irregularities in the application process included

"pre-rejection" of plaintiff, recruitment of unqualified candidates, defendant's undisclosed

decision to help certain applicants with requirements or waive various requirements, and the

sudden introduction of new qualification considerations at the end of the interview process).

Unlike the circumstances in these cases, the interview committee's consideration of additional

materials submitted by Elfers on his own initiative is not indicative of a procedural irregularity or

a bias on the part of any individual involved in the recommendation or selection process.

    As further evidence of irregularities and alleged bias in the application process, plaintiff

notes that although the interview committee had access to the applicants' personnel files during

the interview process, only some of the files included past performance evaluations. (Doc. 57 at

27, citing Doc. 39, Ventre Depo. at 163). Plaintiff contends that the interview committee had no

recent performance evaluations to consider for her because Walton, in his capacity as plaintiff's supervisor, never completed one for her during her tenure as ISP Director. (*Id*., citing Doc. 39, Ventre Depo. at 43, 163). In contrast, Urban, in his capacity as Elfers' supervisor, had completed two annual evaluations for Elfers between May 2008 and May 2010. (*Id*. at 27-28, citing Ventre Depo. Exh. 20). Plaintiff notes that Elfers "past performance" was cited as one of the reasons he was selected over her for the ACPO position (Doc. 39, Ventre Depo. at 188), and she contends that a reasonable jury could conclude that defendants' assertions regarding Elfers' alleged superior performance during the interview process were intended to mask intentional discrimination. (Doc. 57 at 28). However, plaintiff has failed to demonstrate a connection between the lack of performance evaluations in her personnel file and gender. Walton testified that he did not prepare an evaluation for plaintiff during the 18 months he supervised her following Clancy's departure and Elfers' appointment as ACPO, but his failure to do so was consistent with his practice for *all* employees under his supervision. (Doc. 48, Walton Depo. at 51-52, 55). Walton testified that he never prepared an evaluation for any employee unless they did their own evaluation and brought it to him, in which case he would review the evaluation, make comments, and then sign off on it. (*Id*. at 51-52, 55). Walton testified that plaintiff did not bring an evaluation to him during the period of time she was under his supervision. (*Id*. at 55). Further, the three members of the interview committee testified they did not give the performance evaluations that were before them much weight, and Campbell testified that he focused only on deficiencies that were noted in the evaluations. (Doc. 41, Campbell Depo. at 66; Doc. 47, Urban Depo. at 22-23; Doc. 40, Ventre Depo. at 281-82). Thus, plaintiff has not created an issue of fact as to whether she was prejudiced in the application process by the

45

absence of performance evaluations from her personnel file or the interview committee's limited consideration of the evaluations that were before it.

For these reasons, the evidence plaintiff has submitted does not show that she received unequal treatment in the handling of her application and request for consideration during the interview/selection process.  Plaintiff has failed to create a genuine issue of material fact as to whether the interview committee's consideration of subjective factors was a pretext for intentional discrimination.

### v. Alleged discriminatory environment as evidence of pretext

Plaintiff alleges that the Probation Department was a "discriminatory environment" which limited opportunities for women to advance.  (Doc. 57 at 19-22).  Plaintiff alleges that at a minimum, such evidence colors defendants' decision-making process and combined with other evidence of pretext is indicative of unlawful discrimination.  (Doc. 57 at 22, citing *Risch*, 581 F.3d at 393 (citing *Ercegovich*, 154 F.3d at 356-57)).  As discussed above in connection with plaintiff's theory of liability against Walton, plaintiff has not introduced plausible evidence that Walton created a discriminatory environment in the Probation Department.  The evidence plaintiff has introduced in an attempt to show Walton created a discriminatory environment which colored the decisionmaking process does not demonstrate pretext.

### C.  Conclusion

Plaintiff has failed to create a genuine issue of material fact on her sex discrimination claims against defendants Walton and Judge Kubicki.  Plaintiff has not produced competent evidence to show that Walton harbored a bias against females, and she has not introduced evidence which permits an inference that Walton had any involvement in the ACPO promotion decision or that he intentionally influenced the decision.   Nor has plaintiff introduced any

46

evidence to support her sex discrimination claims brought against Judge Kubicki in either his individual or official capacity. Finally, plaintiff has not introduced evidence that shows the legitimate, nondiscriminatory reasons articulated by defendants for the promotion decision are pretextual. Accordingly, defendants Walton and Judge Kubicki are entitled to summary judgment on plaintiff's sex discrimination claims brought against them under both federal and state law.

**VI. The motions for summary judgment are granted as to plaintiff's retaliation claims against defendants Walton and Judge Kubicki.**

**A. Plaintiff's retaliation claim under Ohio Rev. Code Ch. 4112**

Plaintiff brings a retaliation claim against defendants under Ohio Rev. Code Ch. 4112. Plaintiff alleges that defendants decided not to promote her in retaliation for encouraging and assisting Egner in the exercise of her right to file a complaint with the EEOC charging Walton with sexual harassment. (Doc. 6, Am. Complt., ¶¶ 23, 28).

The analysis of a retaliation claim under Title VII and Ohio law is identical. *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 329-30 (6th Cir. 2013) (citing *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 541 (6th Cir. 2003)). To establish a prima facie case of retaliation pursuant to Title VII, a plaintiff must show that: "(1) [s]he engaged in an activity protected by Title VII; (2) the defendant knew [s]he engaged in this protected activity; (3) thereafter, the defendant took an employment action adverse to [her]; and (4) there was a causal connection between the protected activity and the adverse employment action." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004) (citing *DiCarlo v. Potter,* 358 F.3d 408, 420 (6th Cir. 2004) (citation omitted). "An employee's activity is 'protected' for purposes of Ohio Rev. Code Ch. 4112 if the employee has 'opposed any unlawful discriminatory practice' (the 'opposition clause') or 'made a charge, testified, assisted, or participated in any manner in

47

any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code' (the 'participation clause')."  *Veal v. Upreach LLC,* No. 11AP-192, 2011 WL 4986794, at *4 (Ohio App. 10th Dist. Oct. 20, 2011) (citing *HLS Bonding v. Ohio Civ. Rights Comm.,* No. 07AP1071, 2008 WL 3522994, at *3 (Ohio App. 10th Dist. 2008)).

Once the plaintiff establishes a prima facie case, the burden is on the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Ohio Dep't of Pub. Safety*, 997 N.E.2d at 611.  Plaintiff must then establish that the defendant's reason is a pretext for retaliation.  *Id*. at 612.  "[T]raditional principles of but-for causation" applicable to retaliation claims brought under Title VII likewise apply to retaliation claims brought under Ohio Rev. Code § 4112.02.  *Id*. at 614 (quoting *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, _ U.S. __, 133 S.Ct. 2517, 2533 (2013)).  Thus, to prevail on a retaliation claim brought under Ohio Rev. Code § 4112.02(I), the plaintiff must prove that retaliation is the "but-for" cause of the adverse employment action.  *Id*. (citing *Nassar*, 133 S.Ct. at 2533).  To show "but for" causation, plaintiff must prove that the retaliatory animus was a "determinative, not merely motivating, factor."  *Id*.

Although the analysis of a retaliation claim is identical under Title VII and Ohio law, the statutory definition of "employer" under Ohio Rev. Code § 4112.01(A)(2) differs materially from the definition of "employer" under Title VII.  *Genaro*, 703 N.E.2d at 787.  In contrast to Title VII, "for purposes of R.C. Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for [retaliatory] conduct of the supervisor/manager in violation of R.C. 4112."  *Id.* at 787-88; *see also Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 571 n. 2 (6th Cir. 2000) (recognizing *Genaro's* holding).

48

Defendants concede that plaintiff can prove the first three elements of a prima facie case of retaliation under Ohio Rev. Code Ch. 4112: (1) she engaged in protected activity by assisting Egner with a potential discrimination claim against Walton; (2) her employer knew of her protected activity, and (3) she was denied a promotion she sought following her protected activity.  (Doc. 52 at 42).  However, defendants allege that plaintiff cannot establish the fourth element of her retaliation claim because there is no evidence to establish a causal connection between the protected activity and the ACPO selection decision.  (*Id*.).

Plaintiff alleges in response that a reasonable jury could find there was a sufficient causal connection between her act of providing Egner with information related to a possible discrimination claim against Walton and the decision to deny her the promotion to ACPO.  (Doc. 57 at 32).  Plaintiff relies on the temporal proximity between the protected activity and the adverse employment decision, *i.e*., the one-month span between the time Egner first told Ventre that plaintiff had provided her with a phone number for the EEOC and the date the decision appointing Elfers to the ACPO position was made.  (*Id*.).  In addition, plaintiff argues that Judge Kubicki was motivated to select an interview committee that would not recommend plaintiff for the ACPO position and he exercised his discretion to insure plaintiff would not be selected as ACPO.  (*Id*. at 33-35).  Plaintiff contends that Judge Kubicki had a "close" relationship with Walton, he had previously expressed a fear of litigation due to the Egner/Walton situation, and there is evidence he was upset about the situation.  (*Id*. at 33-34).  Plaintiff contends that Judge Kubicki's friendship with Walton and fear of litigation were sufficient to motivate Judge Kubicki to create "a biased interview committee" to ensure that plaintiff would not be recommended for the ACPO position.  (*Id*. at 35).  Plaintiff alleges that as Chair of the Probation Committee, Judge Kubicki "could exercise considerable discretion over the promotion and selection process for

49

Hamilton County employees."  (*Id.* at 34).  Finally, plaintiff asserts that Judge Kubicki had purportedly made a statement that neither plaintiff nor Veatch would receive the position because of their involvement with Egner, which is a statement that can be considered as an admission of a party opponent.  (*Id.* at 34).  Plaintiff contends that defendants offer no new evidence to demonstrate that the reason for the denial was not pretextual, so that summary judgment should be denied on this basis as well.  (*Id.* at 35).

In reply, defendants contend that plaintiff's argument ignores that Egner complained to Ventre about plaintiff unduly pressuring her and harassing her; Judge Kubicki had a problem with this conduct, not with plaintiff's act of providing Egner the number for the EEOC; only two of the three members of the interview committee knew about plaintiff's involvement with Egner; and Judge Kubicki did not act alone but instead all 16 Hamilton County CPP judges were the ultimate decisionmakers in the case.  (Doc. 59 at 16-17).

### B.  Defendant Walton is entitled to summary judgment on the retaliation claim.

The Court finds that plaintiff has not introduced sufficient evidence to raise a genuine issue of material fact on her retaliation claim against defendant Walton.  For the reasons stated in connection with plaintiff's sex discrimination claims against defendant Walton, plaintiff has not introduced any evidence to show that defendant Walton was directly involved in the decision to deny plaintiff the promotion to ACPO.

Nor has plaintiff made any allegations or introduced any evidence in opposition to defendants' motion for summary judgment to support a causal connection between plaintiff's protected activity and the decision to deny her a promotion based on any alleged influence Walton may have had on the committee members.  Plaintiff does not argue that Walton had a retaliatory animus toward her.  (Doc. 57).  Plaintiff does not contend that Walton even knew of

the protected activity which forms the basis for her retaliation claim at any time before the interview committee made its recommendation or the ACPO selection was made by the CCP judges.  (*Id.*).  Nor does plaintiff allege that Walton attempted to influence the interview committee or any other decisionmaker in this case based on a retaliatory motive.  In fact, two of the three members of the interview committee - Urban and Campbell - did not know at any time prior to making their recommendation that Egner was considering filing a charge against Walton or that she had complained about any conduct by plaintiff.  (Doc. 41, Campbell Depo. at 60; Doc. 47, Urban Depo. at 43).  Accordingly, there is no basis for a finding that "but for" Walton's retaliatory animus, plaintiff would have been promoted to ACPO.  *See Ohio Dep't of Public Safety*, 997 N.E.2d at 614.  Absent evidence of a retaliatory motive on Walton's part or evidence showing that he played any role in the ACPO selection decision, plaintiff cannot pursue a retaliation claim against defendant Walton under Ohio Rev. Code Ch. 4112.

**C.  Judge Kubicki is entitled to summary judgment on plaintiff's retaliation claim.**

Plaintiff's retaliation claim against Judge Kubicki is necessarily premised on the theory that Judge Kubicki acted through others to deny plaintiff the promotion to ACPO based on a retaliatory motive.  Judge Kubicki was one of only many ultimate decisionmakers in this case.  Thus, plaintiff seeks to impose liability on Judge Kubicki based on the influence he wielded on other individuals who were involved in the selection process rather than on his ultimate decisionmaking authority.  For the reasons explained below, plaintiff has not introduced sufficient evidence to support the imposition of liability on Judge Kubicki under Ohio anti-retaliation law based on this theory.

The undisputed facts show that Judge Kubicki played a very limited role at the interview phase of the ACPO selection process.  Judge Kubicki appointed Ventre, Campbell and Urban to

the interview committee and decided together with Ventre that all applicants should be interviewed.  (Doc. 45, Kubicki Depo. at 52-53).  Beyond this, Judge Kubicki had no involvement in the interview process itself and never even spoke to Urban or Campbell during the interview process.  (*Id*. at 84-87, 155-56; Doc. 40, Ventre Depo. at 272-73).  Judge Kubicki did not tell Ventre, Campbell or Urban who his choice for the ACPO position was.  (Doc. 45, Kubicki Depo. at 86; Doc. 40, Ventre Depo. at 273-74; Doc. 41, Campbell Depo. at 72; Doc. 47, Urban Depo. at 57-58).  Judge Kubicki never told Ventre, Campbell or Urban that they could not recommend plaintiff for the ACPO position.  (Doc. 45, Kubicki Depo. at 16-17; Doc. 40, Ventre Depo. at 293; Doc. 41, Campbell Depo. at 72, 74).

Judge Kubicki also played a very limited role in the selection process after the interview committee made its recommendation.  Once the interview committee chose its top two candidates for the ACPO position, the interview committee met with Judge Kubicki to inform him of its recommendation.  (Doc. 45, Kubicki Depo. at 86-87; Doc. 40, Ventre Depo. at 272-73; Doc. 41, Campbell Depo. at 71; Doc. 47, Urban Depo. at 44-45).  CCP Judge Jodi Luebbers joined the meeting at Judge Kubicki's invitation while it was in progress.  (Doc. 45, Kubicki Depo. at 86-87; Doc. 40, Ventre Depo. at 274; Doc. 41, Campbell Depo. at 63-64).  At the meeting, the interview committee explained to Judges Kubicki and Luebbers the interview process and how the committee had decided upon Elfers as its first choice and Bonecutter as its second choice.  (Doc. 45, Kubicki Depo. at 88, 131-33; Doc. 41, Campbell Depo. at 63-64).  Judge Kubicki testified that he accepted the interview committee's recommendation because he had confidence in and respect for the three interviewers, and he was impressed with the thorough process they had undertaken in conducting their interviews and reaching their decision.  (Doc. 45, Kubicki Depo. at 131-34).  The Probation Committee then met to make a recommendation to

the Hamilton County CCP judges as a whole based on the interview committee's recommendations.  (Doc. 45, Kubicki Depo. at 116-21).  The Probation Committee voted on the interview committee's recommendation, and the Probation Committee recommended that Elfers be promoted.  (*Id*. at 121).  A majority of the CCP judges signed an entry appointing Elfers as ACPO.  (*Id*. at 121-22; Doc. 39, Ventre Depo. Exh. 19).

Although Judge Kubicki's decisionmaking role in this matter was limited, plaintiff has introduced evidence in an effort to show he used his position as Chair of the Probation Committee to influence the selection of an applicant other than plaintiff for the ACPO position based on a retaliatory animus.  Plaintiff submits hearsay evidence that Judge Kubicki informed the interview committee that plaintiff would not be considered for the position because of her involvement with Egner's situation.  Plaintiff alleges that after the interview process was complete, George told plaintiff that Shannon told George that Kubicki told Shannon that neither Veatch nor plaintiff could serve as ACPO due to their involvement with Egner.  (Doc. 50, Pltf. Depo. at 322-23).  Specifically, plaintiff testified at her deposition that she believes: "Ms. George called me and told me she had a conversation with Tim Shannon.  He had come to her office and said that DeNoma and Veatch were not going to be considered because of our involvement with Ms. Egner's situation."  (Doc. 50, Pltf. Depo. at 322).  This is triple hearsay evidence not subject to an exception, and as such it must be disregarded.  *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also* Fed. R. Civ. P. 56(c)(1)(A) & (4) (requiring an affidavit or declaration to "set out facts that would be admissible in evidence").  Plaintiff argues that this hearsay should be considered as the admission of a party opponent under Fed. R. Civ. P. 801(d)(2)(A).  *See Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (a "statement is not hearsay if . . .  [t]he statement is offered against a party and is . . . a statement by the party's

agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."). However, because the statement at issue is triple hearsay, all three statements must conform to the applicable hearsay exception in order to be admissible. *United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005). The multiple statements plaintiff testified about do not qualify as admissions of a party opponent because two of the declarants - Shannon and George - are not parties to this action and were not decisionmakers in this matter. Accordingly, the hearsay statement offered by plaintiff as the admission of a party opponent must be disregarded. *See Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact.") (citing *Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir. 2000) (disregarding allegations which were based upon hearsay rather than personal knowledge); Fed. R. Civ. P. 56(e)). Further, the Court notes that one of the alleged declarants - Shannon - denied making the statement attributed to him (Doc. 42, Shannon Depo. at 33), and the other alleged declarant - George - testified at her deposition that she could not recall making the statement. (Doc. 46, George Depo. at 28-30). Thus, the statement is not admissible evidence of retaliation.

Plaintiff also alleges that Judge Kubicki was motivated to create a biased interview committee to ensure plaintiff would not be recommended for the ACPO position by (1) his fear of litigation stemming from the Egner/Walton relationship, which plaintiff alleges could only have been heightened by plaintiff's act of providing Egner with the EEOC's phone number, and (2) Judge Kubicki's "friendship" with Walton. (Doc. 57 at 33-35). Plaintiff alleges that Judge Kubicki intentionally selected members of the interview committee who he knew were likely not to recommend plaintiff based on the members' close professional relationships with Walton,

54

membership in Walton's alleged "boys network," and knowledge of the Lausten disciplinary case. (Doc. 57 at 33). Plaintiff further alleges that placing Ventre on the interview committee "as she was actively handling a complaint against Denoma is further evidence that Judge Kubicki set up a committee who would almost certainly not recommend Denoma for a promotion." (*Id*.).

There are several flaws with plaintiff's theory. First and foremost, the timeline of events is unclear, such that the evidence is inconclusive as to whether Judge Kubicki knew of plaintiff's protected activity and her application for the ACPO position at the time he appointed the members of the interview committee. The ACPO job opening was posted in the fall of 2010 and directed applicants to submit their letters of interest and resumes to Walton by Thursday, November 4, 2010. (Doc. 39, Ventre Depo. Exh. 13). However, the date the job was posted is not clear. Moreover, plaintiff has not pointed to any deposition testimony or other evidence that pinpoints when Judge Kubicki selected the members of the interview committee. Absent evidence that Judge Kubicki knew of plaintiff's protected activity and that she had actually applied for the ACPO position at the time he selected the members of the interview committee, an inference cannot be drawn that Judge Kubicki was motivated to create a biased interview committee based on plaintiff's protected activity.

Plaintiff's theory is also flawed because evidence relating to Judge Kubicki's relationship with Walton is too attenuated to serve as proof of a causal connection between plaintiff's protected activity and the creation of a biased interview committee. Plaintiff relies on testimony by Veach that according to the courthouse "rumor mill," Judge Kubicki and Walton had a "close" personal relationship and Veach had witnessed Walton going into Judge Kubicki's chambers to see him on a few occasions, although Veach noted this also happened with other judges. (Doc. 57 at 33, citing Doc. 43, Veach Depo. at 71). Plaintiff also cites testimony by

55

Walton that he "spent a lot of time together" with Judge Kubicki at the courthouse. (*Id.* at 33, citing Doc. 48, Walton Depo. at 29). Plaintiff then alleges that the Probation Committee Chair "could exercise considerable power" over the selection process for CCP employees. (*Id.* at 33-34) (emphasis added). However, plaintiff does not go beyond mere speculation and she does not offer any evidence to show that Judge Kubicki was motivated by his professional relationship with Walton to retaliate against plaintiff in the ACPO selection process by creating a biased interview committee that he knew would not select her for the position. *See Ross*, 402 F.3d at 588. Accordingly, plaintiff's allegations pertaining to Judge Kubicki's relationship with Walton are not probative of a retaliatory motive.

Finally, plaintiff's theory that Judge Kubicki was motivated to create a biased interview committee by his fear that the Egner/Walton relationship might result in litigation (Doc. 57 at 34, citing Doc. 45, Kubicki Depo. at 41), which could have only been heightened by plaintiff providing the EEOC phone number to Egner (Doc. 57 at 34), is insufficient to support a finding of causation. Plaintiff asserts that Judge Kubicki's anger about the Egner/Walton situation is evident from the fact that he called Veatch and plaintiff into his office, which was unusual for a CCP judge, and spoke angrily during the meeting, telling them not to retaliate against Egner. (Doc. 43, Veatch Depo. at 67; Doc. 50, Pltf. Depo. at 379; Doc. 39, Ventre Depo. at 129-130). It is undisputed that Judge Kubicki called Veatch and plaintiff into his office for a meeting with Judge West present concerning a complaint which had been relayed to Judge Kubicki. Judge Kubikci testified that he had received a complaint that Egner had been "badgered and pressured and bullied by [plaintiff and Veatch] . . . into . . . doing something she didn't want to do, which would be filing an EEOC claim and filing a lawsuit and getting a lawyer." (Doc. 45, Kubicki Depo. at 44). During the meeting concerning the complaint, Judge Kubicki advised Veatch and

plaintiff of Egner's allegations against them, told them not to retaliate against Egner, and told

them how they were to handle future complaints. (*Id*. at 110; Doc. 50, Pltf. Depo. at 379-81).

Veatch testified that Judge Kubicki's "initial demeanor was quite accusatory" in that his voice

was raised, he was pointing his finger at Veatch and plaintiff, and he was "very blunt." (Doc. 43,

Veatch Depo. at 67). Plaintiff testified that at the meeting, Judge Kubicki initially was "shaking

his finger" and was "pretty aggressive in his speech," although his demeanor changed once

Veatch started asking him questions. (Doc. 50, Pltf. Depo. at 379). Based on this testimony, a

reasonable fact-finder could infer that Judge Kubicki was angry that plaintiff had provided Egner

with information about pursuing a lawsuit.

However, the evidence provided by plaintiff does not permit the additional inference that

there was a causal connection between any retaliatory animus harbored by Judge Kubicki and the

decision to not promote plaintiff to the ACPO position. *See Smith*, 997 N.E.2d at 613-17 (even

if the supervisor's bias played some role in the plaintiff's termination, the plaintiff failed to

present evidence that the supervisor's role was "a determinative reason" for his termination);

*Kanungo*, 1 F. Supp.3d 674 (finding the plaintiff's cat's paw argument to be unpersuasive where

there was no evidence that any action the supervisor took formed the basis for the plaintiff's

termination). There is no evidence that Judge Kubicki took any action which led the interview

committee to recommend Elfers and Bonecutter as their first and second choices for the ACPO

position. As discussed above, plaintiff has produced no evidence to show that Judge Kubicki

influenced the interview committee's decision process or recommendations in any manner. Nor

is there any indication that Judge Kubicki deviated from the interview committee's

recommendations when presenting them to the Probation Committee as a whole and to the 16

Hamilton County CCP judges, a majority of whom accepted the recommendation of the

interview committee to appoint Elfers to the ACPO position.  Given that Judge Kubicki was but one of the majority of the 16 CCP judges who signed the entry appointing Elfers as ACPO, evidence that Judge Kubicki may have been upset with plaintiff for engaging in protected activity does not suffice to support a finding that "but for" Judge Kubicki's retaliatory animus, plaintiff would have been promoted to ACPO.  *Smith*, 997 N.E.2d at 614.

Finally, plaintiff presents evidence to show there was temporal proximity between her protected activity and the decision by the Hamilton County CCP judges to deny her the ACPO promotion.  The Sixth Circuit has held under certain circumstances, temporal proximity can be sufficient to establish a causal connection.  Specifically:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.  But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Montell v. Diversified Clinical Servs*., Inc., 757 F.3d 497, 505 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008)).  The Court in *Montell* stated that the Sixth Circuit in *Mickey* had "reconcil[ed] two lines of cases, some of which say that temporal proximity alone is not enough, and some that say temporal proximity alone can be enough, and explaining why the two strands diverged[.]"  *Id*. at 505 (citing *Mickey*, 516 F.3d at 523-25).  The Court in *Montell* stated that even in those Sixth Circuit cases finding that temporal proximity alone is not enough to establish causation, the Court found that a causal connection could be established by combining temporal proximity with other evidence of retaliatory conduct.  *Id*. at 506 (citing *Spengler*, 615 F.3d at 494) (noting that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim," but further noting that "there are

circumstances in which temporal proximity, when combined with other evidence of retaliatory

conduct, is enough to establish a causal connection"); *Tuttle v. Metro. Gov't of Nashville*, 474

F.3d 307, 321 (6th Cir. 2007) (noting that "temporal proximity, standing alone, is insufficient to

establish a causal connection for a retaliation claim," but further explaining that "[t]here are,

however, circumstances where temporal proximity, considered with other evidence of retaliatory

conduct would be sufficient to establish a causal connection").  The Court in *Montell* found that

where the ultimatum that the plaintiff should resign or she would be fired was issued the day

after the protected activity occurred, the plaintiff had "presented enough evidence that, were the

jury to believe her story, they could make the reasonable inference that the adverse employment

action [was] so close in time after an employer learns of a protected activity that the action was

caused by that activity."  *Id.* (citing *Mickey,* 516 F.3d at 525).  Moreover, the Court found that

although "it is nearly impossible to come up with other evidence that the adverse employment

action was retaliatory where the adverse action comes directly on the heels of the protected

activity," the plaintiff had introduced additional evidence of a causal connection.  *Id*. at 506.

Under the particular circumstances of this case, temporal proximity is not sufficient to

carry plaintiff's burden to produce evidence of a causal connection.  The time period between the

date Judge Kubicki learned of plaintiff's protected activity and the date the ACPO selection

decision was made was relatively brief.  Egner first told Ventre on October 29, 2010, that

plaintiff had provided her with a telephone number for the EEOC; plaintiff and Veatch had given

Egner other information related to a possible lawsuit against Walton; Egner had called the EEOC

at their urging; and plaintiff and Veatch had been pressuring her into taking legal action against

Walton.  (Doc. 39, Ventre Depo. Exh. 9; Ventre Depo. at 99, 114-119; Doc. 44, Egner Depo. at

51-52, 55-56, 59-60).  Ventre contacted Judge Kubicki the next working day, November 1, 2010,

about the complaint Egner had made against Veatch and plaintiff for putting pressure on her to call the EEOC or see an attorney about Walton's conduct.  (Doc. 39, Ventre Depo. at 121-122). Approximately one month later, on December 1, 2010, a decision appointing Elfers to the ACPO position was made by a majority of the CCP judges.  (Doc. 45, Kubicki Depo. at 117-119, 121; Doc. 39, Ventre Depo. Exh. 19).  While this time frame is short, it is not probative of a causal connection between the protected activity and the adverse decision under the facts presented here.  Rather, there were several intervening steps and decisions between the date Judge Kubicki learned of Egner's complaint and the date Elfers was appointed ACPO which served to break any possible causal connection between the two events.

First, as plaintiff herself notes, interviews for all applicants for the ACPO position were scheduled on November 10, 2010.  (Doc. 39, Ventre Depo. Exh. 15).  Although Judge Kubicki decided with Ventre that all applicants should be interviewed, plaintiff has not introduced any evidence to show that Judge Kubicki had any additional involvement in the interview process. The interview committee completed its duties and made its recommendations to Judge Kubicki as Chair of the Probation Committee and to Judge Luebbers on December 1, 2010.  (Doc. 45, Kubicki Depo. at 88, 117-119, 131-33; Doc. 39, Ventre Depo. at 170-71; Doc. 40, Ventre Depo. at 273-74; Doc. 41, Campbell Depo, at 63; Doc. 52, Att. 3, Luebbers Aff., ¶ 3).  The evidence shows that Judge Kubicki and Judge Luebbers accepted the interview committee's recommendation without deviating from it, and Judge Kubicki then presented the recommendation to the Probation Committee as a whole.  (Doc. 52, Att. 3, Luebbers Aff., ¶ 4; Doc. 45, Kubicki Depo. at 117-119).  The Probation Committee accepted the interview committee's recommendation and Judge Kubicki presented the recommendation on behalf of the Probation Committee to the CCP judges on December 1, 2010, a majority of whom signed the

entry appointing Elfers as ACPO on that same date. (Doc. 45, Kubicki Depo. at 117-21). The initial recommendation by the interview committee, the adoption of the recommendation by the Probation Committee, and the ultimate decision by a majority of the CCP judges to accept the recommendation, coupled with a complete absence of any evidence that Judge Kubicki influenced or altered the interview committee's recommendation in any manner, destroys any inference of a causal connection between plaintiff's protected activity and the CCP judges' selection of Elfers for the ACPO position. *See Ohio Dept. of Pub. Safety*, 997 N.E.2d at 617 (the plaintiff could not prevail on retaliation claim where the "evidence fail[ed] to show that [supervisor] performed an act motivated by retaliatory animus that was intended to cause an adverse employment action and that [the] act was the but-for cause of [plaintiff's] discharge.").

Assuming, *arguendo*, that plaintiff has presented sufficient evidence of a causal connection to establish her prima facie case of retaliation against Judge Kubicki, the next step of the burden-shifting framework requires defendants to offer a legitimate, non-retaliatory reason for the decision to recommend Elfers over plaintiff for the ACPO position. *Ohio Dep't of Pub. Safety*, 997 N.E.2d at 611. Defendants have carried their burden. According to defendants, after completing the interview process, the members of the interview committee explained their selection process and recommendation to Judge Kubicki, the Probation Committee Chair, and to Judge Luebbers, who was invited by Judge Kubicki to listen to the presentation. (Doc. 39, Ventre Depo. at 170-71; Doc. 40, Ventre Depo. at 273-74; Doc. 45, Kubicki Depo. at 88, 131-32, 133; Doc. 41, Campbell Depo. at 63; Doc. 52, Att. 3, Luebbers Aff., ¶ 3). Judge Kubicki determined that the interview committee had conducted a thorough interview process and had given due consideration to all applicants, including plaintiff. (Doc. 45, Kubicki Depo. at 131-134). Judge Luebbers agreed with the interview committee that Elfers was the best choice for

ACPO after listening to the interviewers' explanation of the interview process, their evaluations of the candidates, and their reasons for selecting Elfers as their top choice. (Doc. 52, Att. 3, Luebbers Aff., ¶¶ 2, 4). After Judge Kubicki presented the interview committee's recommendations to the CCP judges on behalf of the Probation Committee, several judges spoke highly of Elfers and agreed that he was a good choice for the ACPO position. (Doc. 45, Kubicki Depo. at 119, 134-35).

For the same reasons discussed *supra* in connection with plaintiff's sex discrimination claims, plaintiff has not produced evidence creating a genuine issue of fact that the reasons for denying plaintiff a promotion to the ACPO position were pretextual. The interview committee presented their reasons for recommending Elfers and Bonecutter as their first and second choices for the ACPO position to Judge Kubicki and the other members of Probation Committee, and the interview committee's recommendation of Elfers as their first choice for the position was in turn accepted by a majority of the Hamilton County CCP judges. The evidence presented by plaintiff does not demonstrate that contrary to the interview committee's conclusions, she was the "plainly superior candidate" for the ACPO position by virtue of her qualifications. (*See supra* at 37). Nor has plaintiff shown that the Lausten/Moxley matter was not a valid consideration for the interview committee to factor into its deliberations; that poor performance of the ISP program under plaintiff's supervision was an insufficient justification for denying the promotion to her; or that there were irregularities in the application process that were indicative of retaliation. Further, plaintiff has not shown that the reasons provided by Judge Kubicki, the Probation Committee as a whole, and the Hamilton County CCP judges for adopting the interview committee's recommendation were not their true reasons. These "intervening legitimate reason[s]" for the adverse employment action "dispel[] an inference of retaliation

based on temporal proximity." *See Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)).

### D. Conclusion

Plaintiff has failed to produce sufficient evidence to create a genuine issue of material fact on her retaliation claims against defendants. The evidence does not permit a reasonable jury to infer that a retaliatory animus by either Walton or Judge Kubicki was a "but-for" cause of the decision to deny plaintiff the promotion to ACPO. Accordingly, defendants Walton and Judge Kubicki are entitled to summary judgment on plaintiff's retaliation claims brought against them under Ohio law.

**IT IS THEREFORE ORDERED THAT:**

Defendants' motion to dismiss/motion for summary judgment brought by Hamilton County Court of Common Pleas, Michael Walton and Judge Charles J. Kubicki, Jr., in his official capacity only (Doc. 52) and defendant Charles J. Kubicki, Jr.'s motion for summary judgment (Doc. 53) are **GRANTED**. Judgment is hereby entered in favor of defendants. This matter is **TERMINATED** on the docket of the Court.

Date:   9/29/2014          s/Karen L. Litkovitz
                           Karen L. Litkovitz
                           United States Magistrate Judge